**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

YASER ESAM HAMDI; ESAM FOUAD
HAMDI, as next friend of Yaser
Esam Hamdi,
              *Petitioners-Appellees,*

v.                                                    No. 02-6895

DONALD RUMSFELD; W. R. PAULETTE,
Commander,
              *Respondents-Appellants.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Robert G. Doumar, Senior District Judge.
(CA-02-439-2)

Argued: June 25, 2002

Decided: July 12, 2002

Before WILKINSON, Chief Judge, and WILKINS and
TRAXLER, Circuit Judges.

---

Reversed and remanded by published opinion. Chief Judge Wilkinson
wrote the opinion, in which Judge Wilkins and Judge Traxler joined.

---

## COUNSEL

**ARGUED:** Paul D. Clement, Deputy Solicitor General, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellants. Geremy Charles Kamens, Assistant Federal Public

Defender, Norfolk, Virginia, for Appellees. **ON BRIEF:** Paul J. McNulty, United States Attorney, Alice S. Fisher, Deputy Assistant Attorney General, Gregory G. Garre, Assistant to the Solicitor General, Lawrence R. Leonard, Managing Assistant United States Attorney, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Frank W. Dunham, Jr., Federal Public Defender, Robert J. Wagner, Assistant Federal Public Defender, Larry W. Shelton, Assistant Federal Public Defender, Norfolk, Virginia, for Appellees.

---

**OPINION**

WILKINSON, Chief Judge:

Esam Fouad Hamdi has filed a petition for a writ of habeas corpus as next friend of his son, Yaser Esam Hamdi, a detainee at the Norfolk Naval Station Brig who was captured as an alleged enemy combatant during ongoing military operations in Afghanistan. In its order of June 11, 2002, the district court concluded that Hamdi's father properly filed his case as next friend, appointed the Federal Public Defender for the Eastern District of Virginia as counsel for the petitioners, and ordered the government to allow the Public Defender unmonitored access to Hamdi. Because the district court appointed counsel and ordered access to the detainee without adequately considering the implications of its actions and before allowing the United States even to respond, we reverse the court's June 11 order mandating access to counsel and remand the case for proceedings consistent with this opinion.

I.

As recounted in the earlier appeal regarding Hamdi's detention, *Hamdi v. Rumsfeld*, No. 02-6827, the al Qaida terrorist network launched massive attacks on the United States on September 11, 2001, killing approximately 3,000 people. In the wake of this tragedy, Congress authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks"

or "harbored such organizations or persons." Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001). The President responded by ordering United States armed forces to Afghanistan to subdue al Qaida and the governing Taliban regime that was supporting it. During this ongoing military operation, thousands of alleged enemy combatants have been captured by American and allied forces including, as the government contends, Hamdi.

Hamdi was initially transferred to Camp X-Ray at the Naval Base in Guantanamo Bay, Cuba. After it came to light that he was born in Louisiana and may not have renounced his American citizenship, Hamdi was brought to the Norfolk Naval Station Brig. His petition claims he was taken into custody in Afghanistan in the fall of 2001, transferred to Guantanamo Bay in January 2002, and transferred again to Norfolk in April 2002. Believing that Hamdi's detention is necessary for intelligence gathering efforts, the United States has determined that Hamdi should continue to be detained as an enemy combatant in accordance with the laws and customs of war.

On May 10, 2002, the Federal Public Defender for the Eastern District of Virginia, Frank Dunham, filed a habeas petition, naming as petitioners both Hamdi and himself as Hamdi's next friend. The Public Defender had been in contact with Hamdi's father, but the father had not sought to be appointed as next friend as of the time the Defender filed his petition. Subsequently, one Christian Peregrim, a private citizen from New Jersey, filed a separate habeas petition on Hamdi's behalf, naming the United States Navy as respondent. On May 29, the district court held a hearing, consolidated the Public Defender's petition with Peregrim's, and concluded that the Defender's case was "properly filed by Frank Dunham as next friend."

After directing the government to respond by June 13, the district court ordered that "Hamdi must be allowed to meet with his attorney because of fundamental justice provided under the Constitution." Further, the court ordered that the meeting be unmonitored and be allowed to take place as of June 1, twelve days before the government's answer was due.

On May 31, the United States filed a motion for stay pending appeal of the district court's access order. We stayed the court's order and heard oral argument four days later.

While these cases were under submission, Hamdi's father filed a separate petition for a writ of habeas corpus under 28 U.S.C. §§ 2241 & 2242, naming as petitioners both Hamdi and himself as next friend. This petition is presently before us. The father's petition asked, *inter alia*, that the district court: (1) "Grant Petitioner Esam Fouad Hamdi Next Friend status, as Next Friend of Yaser Esam Hamdi;" (2) "Appoint counsel to represent Yaser Esam Hamdi because he is indigent and has no funds with which to retain counsel in the United States;" (3) "Order Respondents to cease all interrogations of Yaser Esam Hamdi, direct or indirect, while this litigation is pending;" and (4) "Order that Petitioner Yaser Esam Hamdi be released from Respondents' unlawful custody." Unlike the Public Defender's petition, the father's petition did not specifically request that counsel be granted unmonitored access to Hamdi.

On June 11, before the government had been served with the father's petition, the district court determined that Hamdi's father could proceed as next friend. The court then ordered the government to answer by noon on June 17, and appointed the Public Defender as counsel for the detainee based on the father's affidavit stating that neither he nor his son was able to pay for an attorney. *See* 18 U.S.C. § 3006A. Further, the court again ordered the government to allow the Defender unmonitored access to Hamdi "for the same reasons articulated in the May 29, 2002 Order." The court specified that this meeting was to be "private between Hamdi, the attorney, and the interpreter, without military personnel present, and without any listening or recording devices of any kind being employed in any way." And the court ordered that the meeting be allowed to take place by June 14, three days before the government's response was due. Finally, the court stayed its order to allow the government an opportunity to appeal.

On June 13, the United States filed a second motion for stay pending appeal. The following day, we stayed both the district court's June 11 order and all proceedings before that court regarding the detainee. We heard oral argument on the instant appeal on June 25.

We subsequently dismissed the habeas petitions filed by the Public Defender and Peregrim as Hamdi's next friend. Neither had a significant relationship with the detainee, *Hamdi v. Rumsfeld*, No. 02-6827,

slip op. at 2 (4th Cir. June 26, 2002), and Hamdi's father plainly had a significant relationship with his son and had filed a valid next friend petition. *See id.* at 3 n.1. We therefore turn to the district court's June 11 order.[1]

## II.

The order arises in the context of foreign relations and national security, where a court's deference to the political branches of our national government is considerable. It is the President who wields "delicate, plenary and exclusive power . . . as the sole organ of the federal government in the field of international relations — a power which does not require as a basis for its exercise an act of Congress." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). And where as here the President does act with statutory authorization from Congress, there is all the more reason for deference. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-37 & n.2 (1952) (Jackson, J., concurring). Indeed, Articles I and II prominently assign to Congress and the President the shared responsibility for military affairs. *See* U.S. Const. art. I, § 8; art. II, § 2. In accordance with this constitutional text, the Supreme Court has shown great deference to the political branches when called upon to decide cases implicating sensitive matters of foreign policy, national security, or military affairs. *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 660-61 (1981); *Curtiss-Wright*, 299 U.S. at 319-20; *United States v. The Three Friends*, 166 U.S. 1, 63 (1897); *Stewart v. Kahn*, 78 U.S. 493, 506 (1870); *The Prize Cases*, 67 U.S. (2 Black) 635, 670 (1862).

This deference extends to military designations of individuals as enemy combatants in times of active hostilities, as well as to their detention after capture on the field of battle. The authority to capture those who take up arms against America belongs to the Commander in Chief under Article II, Section 2. As far back as the Civil War, the Supreme Court deferred to the President's determination that those in rebellion had the status of belligerents. *See The Prize Cases*, 67 U.S.

---

[1]For the same reasons stated in our previous opinion, *see Hamdi*, No. 02-6827, slip op. at 5 n.2, we are presented here with an appealable order.

(2 Black) at 670. And in World War II, the Court stated in no uncertain terms that the President's wartime detention decisions are to be accorded great deference from the courts. *Ex parte Quirin*, 317 U.S. 1, 25 (1942). It was inattention to these cardinal principles of constitutional text and practice that led to the errors below.

III.

The district court's June 11 order directed the United States to provide the Public Defender unmonitored access to Hamdi. And petitioners contend that order represented an unexceptional exercise of a district court's discretion in a case challenging the legality of an American citizen's restraint. Petitioners' characterization, however, is incomplete. The court's order was not merely a garden-variety appointment of counsel in an ordinary criminal case. If it had been, the lower court's discretion would be almost plenary and hardly a subject for appeal, much less reversal. *See* 18 U.S.C. § 3006A. But the June 11 order was different in kind. In the face of ongoing hostilities, the district court issued an order that failed to address the many serious questions raised by Hamdi's case.

For example, it has been the government's contention that Hamdi is an "enemy combatant" and as such "may be detained at least for the duration of the hostilities." The government has asserted that "enemy combatants who are captured and detained on the battlefield in a foreign land" have "no general right under the laws and customs of war, or the Constitution . . . to meet with counsel concerning their detention, much less to meet with counsel in private, without military authorities present." The Public Defender for his part has contended that "no evidence has been submitted to support" Hamdi's status as an enemy combatant and that "unlike aliens located outside the United States, Petitioner Hamdi [as an American citizen detained in the United States] is entitled to constitutional protections" including unmonitored access to counsel.

The district court's June 11 order purported to resolve these and many other questions without proper benefit of briefing and argument. Indeed the court directed that counsel have unmonitored access to Hamdi three days before the government's response was even due. There is little indication in the order (or elsewhere in the record for

that matter) that the court gave proper weight to national security concerns. The peremptory nature of the proceedings stands in contrast to the significance of the issues before the court. The June 11 order does not consider what effect petitioner's unmonitored access to counsel might have upon the government's ongoing gathering of intelligence. The order does not ask to what extent federal courts are permitted to review military judgments of combatant status. Indeed, the order does not mention the term enemy combatant at all.

Instead, the June 11 order apparently assumes (1) that Hamdi is not an enemy combatant or (2) even if he might be such a person, he is nonetheless entitled not only to counsel but to immediate and unmonitored access thereto. Either ruling has sweeping implications for the posture of the judicial branch during a time of international conflict, and neither may rest on a procedurally flawed foundation that denied both petitioners and the government a chance to properly present their arguments, or to lay even a modest foundation for meaningful appellate review. The district court's order must be reversed and remanded for further proceedings.

## IV.

### A.

The government urges us not only to reverse and remand the June 11 order, but in the alternative to reach further and dismiss the instant petition in its entirety. In its brief before this court, the government asserts that "given the constitutionally limited role of the courts in reviewing military decisions, courts may not second-guess the military's determination that an individual is an enemy combatant and should be detained as such." The government thus submits that we may not review at all its designation of an American citizen as an enemy combatant — that its determinations on this score are the first and final word.

Any dismissal of the petition at this point would be as premature as the district court's June 11 order. In dismissing, we ourselves would be summarily embracing a sweeping proposition — namely that, with no meaningful judicial review, any American citizen alleged to be an enemy combatant could be detained indefinitely with-

out charges or counsel on the government's say-so. Given the interlocutory nature of this appeal, a remand rather than an outright dismissal is appropriate.

If dismissal is thus not appropriate, deference to the political branches certainly is. It should be clear that circumspection is required if the judiciary is to maintain its proper posture of restraint. *The Prize Cases*, 67 U.S. at 670 ("[T]his Court must be governed by the decisions and acts of the political department of the Government to which this power was entrusted."). The federal courts have many strengths, but the conduct of combat operations has been left to others. *See, e.g.*, *Quirin*, 317 U.S. at 25-26. The executive is best prepared to exercise the military judgment attending the capture of alleged combatants. The political branches are best positioned to comprehend this global war in its full context and it is the President who has been charged to use force against those "nations, organizations, or persons *he determines*" were responsible for the September 11 terrorist attacks. Authorization for Use of Military Force, 115 Stat. at 224 (emphasis added). The unconventional aspects of the present struggle do not make its stakes any less grave. Accordingly, any judicial inquiry into Hamdi's status as an alleged enemy combatant in Afghanistan must reflect a recognition that government has no more profound responsibility than the protection of Americans, both military and civilian, against additional unprovoked attack.

### B.

The standards and procedures that should govern this case on remand are not for us to resolve in the first instance. It has long been established that if Hamdi is indeed an "enemy combatant" who was captured during hostilities in Afghanistan, the government's present detention of him is a lawful one. *See, e.g., Quirin*, 317 U.S. at 31, 37 (holding that both lawful and unlawful combatants, regardless of citizenship, "are subject to capture and detention as prisoners of war by opposing military forces"); *Duncan v. Kahanamoku*, 327 U.S. 304, 313-14 (1946) (same); *In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946) (same). Separation of powers principles must, moreover, shape the standard for reviewing the government's designation of Hamdi as an enemy combatant. Any standard of inquiry must not present a risk

of saddling military decision-making with the panoply of encumbrances associated with civil litigation.

As for procedures, we cannot blueprint them on this appeal. The government has sought to file as an *ex parte*, supplemental attachment to its brief before this court "a sealed declaration discussing the military's determination to detain petitioner Hamdi as an enemy combatant." The government explains that "[t]his declaration is not a matter of record, as it was not proffered in the district court because the proceedings there did not reach the point where the merits of the habeas petition were reached." The government further states that the declaration "specifically delineates the manner in which the military assesses and screens enemy combatants to determine who among them should be brought under Department of Defense control," and "describes how the military determined that petitioner Hamdi fit the eligibility requirements applied to enemy combatants for detention." This declaration is factual in nature. As such, it should come first before the district court, not the court of appeals.

The development of facts may pose special hazards of judicial involvement in military decision-making that argument of questions of pure law may not. For example, allowing alleged combatants to call American commanders to account in federal courtrooms would stand the warmaking powers of Articles I and II on their heads. Finally, the role that counsel should or should not play in resolving questions of law or fact is a matter of immense importance.[2]

## V.

Upon remand, the district court must consider the most cautious procedures first, conscious of the prospect that the least drastic procedures may promptly resolve Hamdi's case and make more intrusive measures unnecessary. Our Constitution's commitment of the conduct of war to the political branches of American government requires the court's respect at every step. Because the district court appointed counsel and ordered access to the detainee without adequately considering the implications of its actions and before allowing the United

---

[2]Whether the financial eligibility requirements of 18 U.S.C. § 3006A have been satisfied is likewise an issue we leave for remand.

States even to respond, we reverse the court's June 11 order mandating access to counsel and remand the case for proceedings consistent with this opinion.

*REVERSED AND REMANDED*