Yaser Esam **HAMDI,** and Esam Fouad Hamdi, As Next Friend of Yaser Esam Hamdi, Petitioners,

v.

Donald **RUMSFELD,** and Commander W.R. Paulette, Respondents.

No. 2:02–CV–439.

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 16, 2002.

the continental United States without charges, without any findings by a military tribunal, and without access to a lawyer. Despite the fact that Yaser Esam Hamdi ("Hamdi") has not been charged with an offense nor provided access to counsel, the Respondents contend that his present detention is lawful because he has been classified as an enemy combatant. Respondents' Response to, and Motion to Dismiss, the Petition for a Writ of Habeas Corpus ("Resp.Brief"), at 9. In denying the Respondents' Motion to Dismiss, the Court of Appeals for the Fourth Circuit rejected the Respondents' contention that the government's determination of Hamdi's status was beyond judicial review stating, "[i]n dismissing... with no *meaningful judicial review,* any American citizen alleged to be an enemy combatant could be detained indefinitely without charges or counsel on the government's say-so." *Hamdi v. Rumsfeld,* 296 F.3d 278, 282 (4th Cir.2002) (emphasis added).

In this Court's hearing on the matter on August 13, 2002, the Respondents conceded that their determination of Hamdi's status was subject to judicial review. However, the Respondents argued that the Mobbs Declaration that it attached to its Response, in and of itself with no further evidence of any kind, was a sufficient factual basis to provide this Court with information adequate to dismiss the writ of habeas corpus. For the reasons stated below, this Court finds the Mobbs Declaration insufficient and once again **ORDERS** the Respondents to submit to the Court the materials previously requested in its July 31, 2002, Order, together with the screening criteria utilized to determine the status of Hamdi with the name(s) and address(es) of the persons who made the determination. The Respondents' Motion for Relief from this Court's production order of July 31, 2002, filed August 5, 2002, is **DENIED.** This Court is highly cogni-

Larry W. Shelton, Office of the Federal Public Defender, Norfolk, VA, Frank W. Dunham, Jr., Office of the Public Defender, Richmond, VA, for Yaser Esam Hamdi.

Esam Fouad Hamdi, Jubail, Saudi Arabia, pro se.

Lawrence Richard Leonard, Office of United States Attorney, Norfolk, VA, Gregory George Garre, U.S. Department of Justice Office of the Solicitor General, Washington, DC, for Respondent.

## ORDER

DOUMAR, District Judge.

This case appears to be the first in American jurisprudence where an American citizen has been held incommunicado and subjected to an indefinite detention in

zant of the Respondents' concerns regarding any national security implications of the requested materials. The Court reiterates that the materials are to be produced solely for in camera review, *ex parte,* by the Court, in order to insure that the documents will in no possible way affect national security. The Court **ORDERS** that the sealed documents be produced by 4:30 p.m. on Wednesday, August 21, 2002, to this Division of this Court for the Judge's in camera review.

*Background*

On September 11, 2001, the al Qaida terrorist network launched an attack on the United States resulting in approximately 3,000 fatalities. Seven days later, Congress responded by authorizing the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" or "harbored such organizations or persons." Authorization for Use of Military Force, Pub.L. No. 107–40, 115 Stat. 224 (2001). The President subsequently ordered United States armed forces to Afghanistan to subdue al Qaida and the governing Taliban regime that was supporting it. In late 2001, the Respondents contend that Yaser Esam Hamdi surrendered to Northern Alliance forces that were acting in conjunction with American forces during these military operations.

Although the circumstances of Hamdi's surrender and detention are anything but clear, he was apparently classified as an "enemy combatant" that met certain "screening criteria"[1] and turned over to U.S. military control. Hamdi was transferred to Camp X–Ray at the Naval Base in Guantanamo Bay, Cuba together with hundreds of other detainees of like circumstances. It appears that the government, realizing that Hamdi was born in the United States, looked upon him somewhat differently. For reasons that are still unclear, Hamdi was subsequently transferred to the Norfolk Naval Station Brig, Norfolk, Virginia, U.S.A. in April 2002.

On May 10, 2002, the Federal Public Defender for the Eastern District of Virginia, Frank Dunham, filed a habeas corpus petition, naming as petitioners both Hamdi and himself as Hamdi's next friend. After holding a hearing on May 29, 2002, this Court concluded that the habeas corpus petition was properly filed and ordered that Hamdi be allowed to meet with the Federal Public Defender on June 1, 2002. On May 31, 2002, the Respondents filed a motion in the Court of Appeals for the Fourth Circuit for a stay pending appeal of this Court's access order on the grounds that there was an insufficient relationship between Hamdi and the Federal Public Defender. The Court of Appeals granted the Respondents' Motion.

While the Federal Public Defender's petition was submitted to the appeals court, Esam Fouad Hamdi, the detainee's father, filed a separate petition for a writ of habeas corpus naming as petitioners both Yaser Esam Hamdi and himself as next friend. On June 11, 2002, this Court found that Hamdi's father had properly filed his habeas petition as next friend, appointed the Federal Public Defender as counsel for Petitioners, and ordered the Respondents to allow counsel access to Hamdi. The Respondents then filed a motion for stay in

---

1. The Respondents have not produced the screening criteria to this Court and have stated that the criteria are classified. In its Response, filed on July 25, 2002, the Respondents went on to suggest that it could submit to this Court a copy of the screening criteria *ex parte* and under seal. Resp. Brief, at 3 n.1. However, in the hearing conducted by this Court on August 13, 2002, the Respondents indicated that they are now unwilling to produce any additional information.

the Court of Appeals for the Fourth Circuit pending appeal of the June 11, 2002, Order. On June 14, 2002, the Court of Appeals granted the Respondents' Motion for a stay of this Court's June 11 2002, Order and further ordered a stay of all proceedings before this Court in connection with Hamdi.

On June 26, 2002, the appellate court dismissed the petition brought by Frank Dunham finding an insufficient relationship between Mr. Dunham and the detainee. *Hamdi v. Rumsfeld*, No. 02–6827, slip op. at 2 (4th Cir. June 26, 2002). The appeals court further held that Hamdi's father had a sufficient relationship with Hamdi and had filed a valid next friend petition. *See id.* at 3 n. 1.

On July 12, 2002, the Court of Appeals ruled on the Respondents' Appeal regarding this Court's June 11, 2002, access Order. *Hamdi v. Rumsfeld*, 296 F.3d 278 (4th Cir.2002). In their appeal, the Respondents argued that the habeas petition should be dismissed in its entirety, or alternatively, the case should be reversed and remanded to this Court for further proceedings. The appeals court declined to dismiss the petition, finding that such dismissal would be premature. *Id.* at 282. Instead, the Court of Appeals reversed this Court's June 11, 2002, Order and remanded the case for further proceedings. *Id.* at 280. In reversing, the appellate court held that this Court failed to extend to the political branches the appropriate deference in matters of foreign policy and national security. *Id.* at 281. The appellate court then directed this Court to consider "the most cautious procedures first, conscious of the prospect that the least drastic procedures may promptly resolve Hamdi's case and make more intrusive measures unnecessary." *Id.* at 282–3.

On August 8, 2002, the Court of Appeals for the Fourth Circuit dissolved its stay order of June 14, 2002. In doing so, the Appeals Court stated "that the district court may proceed in strict compliance with our July 12, 2002 decision." August 8, 2002 Order at 1. The Court of Appeals further directed this Court to "consider the sufficiency of the Mobbs Declaration as an independent matter before proceeding further." *Id.* at 280.

In response, this Court analyzed the Mobbs Declaration, considered briefs submitted from both the Respondents and the Federal Public Defender, and heard oral argument on August 13, 2002, from both sides. In strict compliance with the Court of Appeals August 8, 2002 Order, the sole purpose of the hearing was to determine whether the Mobbs Declaration, *standing alone*, was sufficient justification for a person born in the United States to be held without charges, incommunicado, in solitary confinement, and without access to counsel on U.S. soil.

*Discussion*

This case represents the delicate balance that must be struck between the Executive's authority in times of armed conflict and the procedural safeguards that our Constitution provides for American citizens detained in the United States. Due to the uncertainty regarding Hamdi's status whether he was an enemy combatant, was an unlawful enemy combatant, or just a bystander, the legal considerations are further complicated by the protections potentially afforded by the international law of war as expressed in the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949. 6 U.S.T. 3316, 75 U.N.T.S. 135 ("GPW"), to which the United States is a signatory. Depending on Hamdi's status, the joint service regulations governing the detention of captured enemy combatants or others may also be implicated. *See* Joint Service Regulation, *Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other De-*

*tainees* (Oct. 1, 1997)(hereinafter Joint Service Regulation). These regulations "provide[ ] policy, procedures, and responsibility for the administration, treatment, employment, and compensation of enemy prisoners of war (EPW), retained personnel (RP), civilian internees (CI) and other detainees (OD) in the custody of U.S. Armed Forces." *Id.* at 1. The exact legal force of these regulations is not now determined, but the regulation states that it "implements international law, both customary and codified, relating to EPW, RP, CI, and ODs which includes those persons held during military operations other than war." *Id.* It specifically lists the GPW as one of the relevant treaties in its determination of international law. *Id.* At the very least, the Joint Service Regulation illustrates the U.S. military's position regarding its obligations under the GPW. Any decision regarding the legal effect of the GPW or the Joint Regulations would be premature at this point in the proceedings as it is necessary to first develop a factual background by which Hamdi's classification may be evaluated.[2] Under the facts that the Court has before it at this time, the Respondents have not shown that the requirements of the GPW nor the Joint Service Regulations, which apply regardless of the treaty, have been complied with. In light of the cautious procedures that the Court of Appeals outlined for this Court to follow, any determination of these issues would be premature as it is necessary to first develop a factual background.

■ The judiciary has traditionally shown "great deference to the political branches when called upon to decide cases implicating sensitive matters of foreign policy, national security, or military affairs." *Hamdi v. Rumsfeld*, at 282. The Supreme Court has made it clear that the President is afforded deference when exercising his authority as Commander in Chief. *Ex parte Quirin*, 317 U.S. 1, 28–29, 63 S.Ct. 1, 87 L.Ed. 3 (1942). Deference is proper because of the Executive's special competency, and constitutional responsibility, over the conduct of overseas military operations. Deference to the President is particularly appropriate when Congress has authorized the Executive to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons." Authorization for Use of Military Force, Pub.L. No. 107–40, 115 Stat. 224 (2001). This deference extends to military designations of individuals as enemy combatants. *Hamdi v. Rumsfeld*, 296 F.3d at 282.

**2.** The Joint Service Regulations as well as the treaty indicate that where a detainee's status may be in doubt that a military tribunal, appointed by the general courts-martial convening authority, must determine whether the detainee is a Prisoner of War. *See* Joint Service Regulation 1–6(b)("A competent tribunal shall determine the status of any person not appearing to be entitled to prisoner of war status who has committed a belligerent act or has engaged in hostile activities in aid of enemy armed forces, and who asserts that he or she is entitled to treatment as a prisoner of war, or concerning whom any doubt of a like nature exists."); Joint Service Regulation Glossary ("Other Detainee—Persons in the custody of the U.S. Armed Forces who have not been classified as an EPW (article 4, GPW), RP (article 33, GPW), or CI (article 78, GC), shall be treated as EPWs until a legal status is ascertained by competent authority."); GPW Art. 5("Should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.")(the GPW does not allude to general courts-martial convening authority).

■ While it is clear that the Executive is entitled to deference regarding military designations of individuals, it is equally clear that the judiciary is entitled to a meaningful judicial review of those designations when they substantially infringe on the individual liberties, guaranteed by the United States Constitution, of American citizens. The scope of "any judicial inquiry into Hamdi's status as an alleged enemy combatant in Afghanistan must reflect a recognition that government has no more profound responsibility than the protection of Americans, both military and civilian, against additional unprovoked attack." *Id.* at 282. The standard of judicial inquiry must also recognize that the "concept of 'national defense' cannot be deemed an end in itself, justifying any exercise of [executive] power designed to promote such a goal. Implicit in the term 'national defense' is the notion of defending those values and ideals which sets this Nation apart.... It would indeed by ironic if, in the name of national defense, we would sanction the subversion of one of those liberties ... which makes the defense of the Nation worthwhile." *United States v. Robel,* 389 U.S. 258, 264, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).

■ The Due Process Clause of the Fifth Amendment prohibits the government from "depriving" any person of liberty "without due process of law." U.S. Const. Amend. V. While Petitioners concede that Hamdi's initial detention in a foreign land during a period of ongoing hostilities is not subject, for obvious reasons, to a due process challenge, Petitioners argue that the continuing indefinite imprisonment on U.S. soil, in solitary confinement, and without access to counsel violates the detainee's Fifth Amendment rights. Petitioners' Traverse and Response to Respondents' Motion to Dismiss ("Pet.Brief"), at 20. For its part, the Respondents argue that Hamdi's due process rights have not been violated because of

the "historical unavailability of any right to prompt charges or counsel for those held as enemy combatants." Resp. Brief, at 10. When asked during the August 13, 2002, hearing what, if any, constitutional protections Hamdi was entitled to, counsel for the Respondents responded that the Constitution applied to the same extent as "it did to the individual who was alleged to be an American citizen in the *Quirin* case." August 13, 2002, Hr'g Tr. at 7. Upon further questioning by the court, the Respondents' counsel conceded that the individual in *Ex parte Quirin* that it referred to was afforded access to counsel and the opportunity to defend himself before a military tribunal. *Id.* It is apparent that the defendant in *Quirin* to whom the Respondents referred was provided with a significantly broader measure of due process than Hamdi has received thus far. This Court finds that Hamdi is entitled to due process of law as provided by the Fifth Amendment to the United States Constitution.

■ The question then becomes whether the Respondents' classification of Hamdi's combatant status has violated his due process rights under the Constitution. The Respondents contend that the Mobbs Declaration is sufficient, by itself, to allow this Court to conduct a meaningful judicial review to insure that the government has not violated any of Hamdi's rights and protections. While recognizing the deference due to the Executive's decisions regarding combatant status classifications, the Court finds that a meaningful judicial review must, at a minimum, determine:

(1) Whether the government's classification of the detainee's status was determined pursuant to appropriate authority to make such determinations.

(2) Whether the screening criteria used to make and maintain the classification of an American born detainee

held in the continental United States met sufficient procedural requirements as to be consistent with the Fifth Amendment's prohibition against governmental deprivation of life, liberty, or property without due process of law.

(3) On what basis has the government determined that the continuing detention of Hamdi without charges and without access to counsel serves national security.

(4) Whether the Geneva Treaty or the Joint Services Regulations required a different process.[3]

An examination of the Mobbs Declaration reveals that it falls far short of even these minimal criteria for judicial review. The Respondents produced the Mobbs Declaration as attachment 1 to its brief filed on July 25, 2002. The document is two pages long and consists of nine numbered paragraphs. The declaration is signed by a Michael H. Mobbs and dated July 24, 2002. A thorough examination of the Mobbs Declaration reveals that it leads to more questions than it answers.

■ The declaration fails to address the nature and authority of Mr. Mobbs to review and make declarations on behalf of the Executive regarding Hamdi's classification. Paragraph 1 of the Mobbs Declaration states that Mr. Mobbs is a Special Adviser to the Undersecretary of Defense for Policy. Mobbs Decl. at 1. The declaration does not indicate what authority a "Special Advisor" has regarding classification decisions of enemy combatants. Indeed, the declaration does not indicate whether Mr. Mobbs was appointed by the President, is an officer of the United States, is a member of the military, or even a paid employee of the government. During the August 13, 2002, hearing, when asked to explain Mr. Mobbs' authority and role in Hamdi's classification as an enemy combatant, the Respondents' counsel was unable to do so. Tr. at 10. In a general way, the declaration never refers to Hamdi as an "illegal" enemy combatant. The term is used constantly in Respondents' Memorandum. Nor is there anything in the declaration about intelligence or the gathering of intelligence from Hamdi. There is a huge amount of this in legal arguments. There is nothing to indicate why he is treated differently than all the other captured Taliban. There is no reason given for Hamdi to be in solitary confinement, incommunicado for over four months and being held for some eight-to-ten months without any charges of any kind. This is clearly an unreasonable length of time to be held in order to bring criminal charges.[4] So obviously criminal charges are not contemplated.

In Paragraph 2 of the Mobbs Declaration, Mr. Mobbs claims a familiarity with the policies and procedures applicable to Hamdi's detention. He claims to have reviewed the relevant records and reports regarding Hamdi's detention and capture. Mobbs Decl. at 1. The declaration does not answer under whose authority and by what procedures Mr. Mobbs engaged in such a review. Nor does it explain whether Mr. Mobbs is responsible for supervising the classification decisions of others. These are important considerations for any meaningful judicial review because the Court must be able to determine whether the person(s) making the classification decision did so with the authority of the Executive and pursuant to the statutes,

---

**3.** Counsel for the Respondents indicate that the armed services did not have to follow the Joint Service Regulations when first taking Hamdi in custody. August 13, 2002, Hr'g Tr. 30, 31.

**4.** Confinement for 48 hours triggers the right to a preliminary hearing. *Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991).

rules, and regulations pertaining to such matters.

The declaration is insufficient to determine whether the screening criteria used by the government in classifying Hamdi and in making the decision to transfer Hamdi to the Norfolk Naval Brig violated his Fifth Amendment rights to the due process of law or violated the law or regulations of the Country. In paragraph 3 of the declaration, Mr. Mobbs states that Hamdi was "affiliated with a Taliban military unit and received weapons training." *Id.* The declaration makes no effort to explain what "affiliated" means nor under what criteria this "affiliation" justified Hamdi's classification as an enemy combatant. The declaration is silent as to what level of "affiliation" is necessary to warrant enemy combatant status. These are crucial determinations for purposes of judicial review. It does not say where or by whom he received weapons training or the nature and extent thereof.[5] Indeed, a close inspection of the declaration reveals that Mr. Mobbs never claims that Hamdi was fighting for the Taliban, nor that he was a member of the Taliban. Without access to the screening criteria actually used by the government in its classification decision, this Court is unable to determine whether the government has paid adequate consideration to due process rights to which Hamdi is entitled under his present detention.

In Paragraph 4 of the Mobbs Declaration, it indicates that Northern Alliance forces were engaged in battle with the Taliban. It does not say that the Taliban unit to which Hamdi was "affiliated" was ever in any battle while Hamdi's was "affiliated." *Id.* Nor does it identify the unit. Nor does it indicate who commanded the unit or the type of garb or uniform Hamdi may have worn when taken by the Northern Alliance. It further indicates after Hamdi "surrendered" that he kept his weapon.[6] He only gave up the weapon prior to being placed in prison. All the while he was under the care, custody and control of Northern Alliance forces. Whether the forces he surrendered to was led by a "war lord" or the unidentified unit to which he was "affiliated" was led by a "war lord" or whether the war lords changed sides is not set forth.

In paragraph 5 of the declaration, the U.S. interrogation team interviewed Hamdi while he was under the "Northern Alliance" control. It says that Hamdi identified himself as a Saudi citizen who had been born in the United States.[7] Mr. Mobbs claims that during the interview, Hamdi admitted that he "entered Afghanistan the previous summer to train with and, *if necessary*, fight for the Taliban." *Id.* (emphasis added). The Court notes that the declaration does not quote from this alleged admission from Hamdi, but rather appears to be paraphrased. A possible inference from Hamdi's alleged statement was that he was not fighting for the Taliban when he was surrendered to the Northern Alliance forces. It does not indicate what the "if necessary" connotes. Does it mean in self defense or did a threatened force from the Taliban make it "necessary?"

---

5. Did someone give him a weapon and say "here's the safety and there's the trigger?"

6. This doesn't sound like he was expected to fight or escape.

7. The regulation required such a team to determine the name, rank, date of birth, city and country of birth, name and address of next of kin, date of capture, place of capture, capturing unit, circumstances of capture, nation in whose armed services the individual is serving and much more information. Joint Services Regulation 1–7.

Paragraph 6 of the Declaration states Hamdi was originally classified as an enemy combatant by "military forces" based upon his interviews and in light of his association with the Taliban. *Id.* at 2. The document is silent on whose military forces, i.e. U.S. military forces or Northern Alliance forces, who originally classified Hamdi as an enemy combatant. If it was Northern Alliance forces that originally classified him, then it is unclear how Northern Alliance forces differentiated themselves from Taliban forces during the conflict. Was there some garb of each that made identification easy to participants? Is any individual associated with or near the Taliban an "enemy combatant?"

In paragraph 7, Mr. Mobbs states that Hamdi was determined to meet the "criteria" for enemy combatants by the U.S. military screening team at the Sheberghan prison. *Id.* There is no mention of the criteria used to make such a determination.

In paragraph 8, the declaration states that "a Detainee Review and Screening Team established by Commander, U.S. Central Command reviewed Hamdi's record and determined he met the criteria established by the Secretary of Defense for individuals over whom U.S. forces should take control and transfer to Guantanamo Bay." *Id.* It is unclear whether the Detainee Review and Screening Team's criteria at Kandahar was the same criteria used to make the determination regarding Hamdi's status as an enemy combatant at Sheberghan. It does not list the criteria used.

In paragraph 9, the declaration asserts that a "subsequent interview of Hamdi has confirmed the fact that he surrendered and gave his firearm to Northern Alliance forces which supports his classification as

an enemy combatant." *Id.* at 2. Again, it appears that Mr. Mobbs is merely paraphrasing a statement supposedly made by Hamdi. Due to the ease with which such statements may be taken out of context, the Court is understandably suspicious of the Respondents' assertions regarding statements that Hamdi is alleged to have made. While it may be premature, and eventually unnecessary, for the Court to bring Hamdi before it to inquire about these statements, the Court finds that it must be provided with complete copies of any statements by Hamdi in order to appropriately conduct a judicial review of his classification. Petitioners' counsel asserted at the hearing that some of these statements were unclassified and provided by the government to counsel for John Phillip Walker Lindh in a companion case in this district.

Without access to the screening criteria and Hamdi's statements, it is impossible to evaluate whether Mr. Mobbs is correct in his assertion that Hamdi's classification as an enemy combatant is justified. The Mobbs Declaration is little more than the government's "say-so" regarding the validity of Hamdi's classification as an enemy combatant. If the Court were to accept the Mobbs Declaration as sufficient justification for detaining Hamdi in the present circumstances, then it would in effect be abdicating any semblance of the most minimal level of judicial review. In effect, this Court would be acting as little more than a rubber-stamp. While the Respondents may very well be correct that Hamdi is appropriately classified as an enemy combatant, the Court is unwilling on the sparse facts before it to find so at this time. Obviously, the Respondents have the information as the United States military generally follows their own regulations.[8]

---

**8.** Disobedience of regulations generally re-     sults in discipline actions.

We must protect the freedoms of even those who hate us, and that we may find objectionable. If we fail in this task, we become victims of the precedents we create. We have prided ourselves on being a nation of laws applying equally to all and not a nation of men who have few or no standards. The warlords of Afghanistan may have been in the business of pillage and plunder. We cannot descend to their standards without debasing ourselves. We must preserve the rights afforded to us by our Constitution and laws for without it we return to the chaos of a rule of men and not of laws. Our Constitution was the first to develop a government of checks and balances. The legislative, executive, and judicial branches each check each other. While the Executive may very well be correct that Hamdi is an enemy combatant whose rights have not been violated, the Court is unwilling, on the sparse facts before it to find so at this time on the basis of the Mobbs Declaration. Therefore it is necessary to obtain the additional facts requested.

The Clerk of the Court is **DIRECTED** to transmit this Order via facsimile and U.S. mail to all counsel or record and to mail a copy to Yaser Esam Hamdi.

**IT IS SO ORDERED.**