WILKINSON, Circuit Judge,
concurring in the denial of rehearing en banc:
I concur in the denial of the rehearing en banc. The panel opinion written by Chief Judge Wilkins, Judge Traxler, and myself has already properly resolved this ease. See Hamdi v. Rumsfeld, 316 F.3d 450 (4th Cir.2003). I thus offer only these few comments in response to the dissent of my good colleague Judge Motz.
Hamdi is being held according to the time-honored laws' and customs of war. There is nothing illegal about that. The option to detain those captured in a zone of armed combat for the duration of hostilities belongs indisputably to the Commander in Chief. Art. II, Sec. II. And the question is essentially whether the United States can capture and detain prisoners of war without subjecting the factual circumstances surrounding foreign battlefield seizures to extensive in-court review.[1] The answer to this is now — and always has been — yes. In giving prisoners of war the right to litigate their detentions in Ameri-ean courts, the dissent would install a more restrictive regime on the executive branch after September 11 than existed before. I regret that my colleague does not even quote the provisions of Article I and Article II which delegate the conduct of war to the coordinate branches of our government. For the course on which my dissenting colleague is embarked will trespass, increment by increment, upon those powers, to the detriment of the judiciary’s own obligation to respect the proper limits and boundaries of its role.
To claim, as my colleague does here, that there was no meaningful judicial review of Hamdi’s detention is incorrect. There was extensive review of every legal challenge to Hamdi’s detention. The dissent wishes to proceed further and litigate precisely why petitioner was seized and whether the military capture can be justified. The conduct of war, however, involves innumerable discretionary decisions made by our armed forces in the field every day. Many of them have life or death consequences. To subject these discretionary decisions made in the course of foreign combat operations to the prospect of domestic litigation would be an unprecedented step. Doing so would ignore the fundamentals of Article I and II — namely that they entrust to our armed forces the capacity to make the necessary and tradi *342 tional judgments attendant to armed warfare, and that among these judgments is the capture and detention of prisoners of war. See The Prize Cases, 67 U.S. 635, 670, 2 Black 635, 17 L.Ed. 459 (1862).
Hamdi’s own filings make clear that he was seized in a zone of active combat operations. Hamdi’s petition notes that “[w]hen seized by the United States Government, Mr. Hamdi resided in Afghanistan.” See Petition for Habeas Corpus, p. 2. In their traverse, petitioners state that the petition does not “implicate Respondents’ initial detention of Petitioner Hamdi in Afghanistan.” See Traverse and Response to Respondent’s Motion to Dismiss, p. 2. And outside the legal arena, petitioner Esam Fouad Hamdi, in a letter to Senator Patrick J. Leahy, stated that they were “not challenging the battlefield determination, decision to detain individuals in the theater of combat.” See Letter to Senator Patrick J. Leahy, August 5, 2002. Even the district court, while ordering a more intrusive examination of the circumstances of Hamdi’s capture, noted that “[petitioners concede that Hamdi’s initial detention in a foreign land during a period of ongoing hostilities is not subject, for obvious reasons, to a due process challenge.” See Order of August 16, 2002, p. 8.[2] Our review of the petition was undertaken in light of this undisputed fact.
With respect, the dissent’s demand for further factual inquiries raises many more questions than it answers. The dissent notes vaguely that it wants a non-hearsay basis for petitioner’s detention and that the Mobbs Declaration must be probed for every incompleteness or inconsistency. Post at 368. While the dissent appears to acknowledgé that the district court production order went too far, its specific criticisms of the Mobbs Declaration suggest otherwise. This desire to have courts wade further and further into the supervision of armed warfare ignores the undertow of judicial process, the capacity of litigation to draw us into the review of military judgments step by step.
The dissent declines to acknowledge the perils in its path, and we are left to guess at how it would proceed. Opposing affidavits would not likely satisfy the dissent, for they would leave the court to weigh one *343 protestation against the other with little means of doing so. Ex parte, in camera review would set disputes in motion over the scope of redaction and create a whole new set of secrecy issues surrounding Hamdi’s case. Ex parte, in camera submissions would likely please no one — neither the government required to hand over potentially sensitive materials, nor Hamdi who would be denied the chance to contest an ex parte review of them, nor the public who would be left in the dark about the real basis for resolving Hamdi’s case. My dissenting colleague also laments the absence of “first-hand knowledge of Hamdi’s conduct or status in Afghanistan.” See post at 373. The dissent is plainly unwilling to trust the judgment of those actually fighting the war that Hamdi was properly seized. What further steps should the judiciary then be prepared to take? What kind of hearings? What role for counsel? What kind of showings? What sort of witnesses? The district court struggled with these questions to ill effect. See Hamdi, 316 F.3d at 470-71; Hamdi v. Rumsfeld, 243 F.Supp.2d 527 (E.D.Va.2002).
My colleague’s desire for more and more information signals not the end of a constitutionally intrusive inquiry, but the beginning. To start down this road of litigating what Hamdi was actually doing among the enemy or to what extent he was aiding the enemy is to bump right up against the war powers of Articles I and II. Judges are ill equipped to serve as final and ultimate arbiters of the degree to which litigation should be permitted to burden foreign military operations. The ingredients essential to military success — its planning, tactics, and intelligence — are beyond our ken, and the courtroom is a poor vantage point for the breadth of comprehension that is required to conduct a military campaign on foreign soil.
Because I think it both unreasonable and unfair to expect either judges or attorneys to discard a lifetime of honed instinct, I suspect that in time, if the course of the dissent is followed, the norms of the criminal justice process would come to govern the review of battlefield detentions in federal court. The prospect of such extended litigation would operate to inhibit our armed forces in taking the steps they need to win a war. The specter of hindsight in the courtroom would haunt decision-making in the field. At a minimum, if rules are to be prescribed for litigating something as sensitive as the soundness of battlefield detentions in Article III courts, then the prescription should come from Congress or the Executive — the branches of government charged by our Constitution with the conduct of foreign war. I cannot conceive of the courts on their own motion — without the considered input of the political branches — devising a set of procedures allowing prisoners of war to hold American commanders accountable in federal court. If any illustration of the difficulties and hazards of such a judicial enterprise were needed, the history of Hamdi’s case should more than suffice.
My colleague also interprets a series of World War II-era Supreme Court cases as invitations for the judiciary to involve itself in an exacting review of decisions made on foreign battlefields. Post at 369-371. My colleague’s overreading of these decisions misses their fundamental import: they are replete with warnings that the judiciary must stay its hand when reviewing an exercise of the Commander-in-Chief powers during wartime. Ex parte Quirin, for example, holds without reservation that detentions “ordered by the President in the declared exercise of his powers as Commander in Chief of the Army in time of war and of grave public danger” should not “be set aside by the courts without the clear conviction that they are in conflict *344 with the Constitution or laws of Congress constitutionally enacted.” 317 U.S. 1, 25, 63 S.Ct. 2, 87 L.Ed. 3 (1942). Likewise, Johnson v. Eisentrager emphasized that “[ejxecutive power over enemy aliens”— the enemy combatants at issue in that case — “undelayed and unhampered by litigation, has been deemed, throughout our history, essential to war-time security.” 339 U.S. 763, 774, 70 S.Ct. 936, 94 L.Ed. 1255 (1950); see also id. at 778-79, 70 S.Ct. 936 (detailing the crippling complications that would arise from allowing searching judicial review of the petitioners’ detention). And In re Yamashita noted that the military tribunals challenged in that case were “not subject to judicial review merely because they have made a wrong decision on disputed facts.” 327 U.S. 1, 8, 66 S.Ct. 340, 90 L.Ed. 499 (1946). “Such great war powers may be abused, no doubt, but that is a bad reason for having judges supervise their exercise, whatever the legal formulas within which such supervision would nominally be confined.” Ludecke v. Watkins, 335 U.S. 160, 172, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948). These cases are caution signals to the judiciary, not green lights.
I seriously doubt that any mistake was made in Hamdi’s case. But the Supreme Court in Ex parte Quirin, Johnson v. Eisentrager, and In re Yamashita was fully aware that war was a messy business, that mistakes could be made, but that close judicial review was nonetheless costly and constitutionally proscribed. And the panel in this case did not seek to move further than the precise case before it. See Hamdi, 316 F.3d at 465. To compare this battlefield capture to the domestic arrest in Padilla v. Rumsfeld is to compare apples and oranges. Moreover, the rechar-acterizations of the holding in the dissent are manifestly far afield. The panel did not suggest that its holding would apply to any part of the world where American troops might happen to be present. There is not the slightest resemblance of a foreign battlefield detention to the roundly and properly discredited mass arrest and detention of Japanese-Americans in California in Korematsu. These attempts to recharacterize the holding of the-panel find no support in the opinion’s text itself.
Finally, although both the panel opinion and the dissent have noted the evidentia-ry shortcomings of the Mobbs Declaration, there is a value to having the United States state under oath its reasons for the detention of an American citizen, even one captured during the course of armed combat.[3] To go further, however, would be folly. It is precisely at the point of armed combat abroad that the government’s detention interests in gathering vital intelligence, in preventing detainees from rejoining the enemy and in stemming the diversion of military resources abroad into litigation at home are at their zenith. It diminishes these interests to inquire whether the judiciary deems them “legitimate,” “substantial,” or “compelling,” for they are grounded in the wording of Articles I and II themselves. The *345 federal judiciary plays a vital role in securing our rights. But the other branches of government also play their part in securing the blessings of our liberty. In this case, the paramount right is that of the citizens of our country to have their democracy’s most vital, life-or-death decisions made by those whom the Constitution charges with that task.
In sum, this petition was properly dismissed.

. The government does not concede that Hamdi is a prisoner of war, but rather asserts that he is an unlawful combatant. For the purposes of this case, the distinction is irrelevant because the decision to detain until the cessation of hostilities belongs to the executive in either case. See Hamdi, 316 F.3d at 469.
The panel earlier expressed doubt that the timing of a cessation of hostilities was even justiciable. Hamdi v. Rumsfeld, 316 F.3d at 476 (quoting Ludecke v. Watkins, 335 U.S. 160, 169, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948) ("Whether and when it would be open to this Court to find that a war though merely formally kept alive had in fact ended, is a question too fraught with gravity even to be adequately formulated when not compelled.”)). It would be an intrusive venture into international relations for an inferior federal court to declare a cessation of hostilities and order a combatant's release when an American military presence remained in the theater of combat and when the status of combatants, their terms of release, and the mutuality of exchanges may all remain subjects for negotiation and diplomacy. See Ludecke, 335 U.S. at 169, 68 S.Ct. 1429; The Three Friends, 166 U.S. 1, 63, 17 S.Ct. 495, 41 L.Ed. 897 (1897); The Prize Cases, 67 U.S. 635, 670, 2 Black 635, 17 L.Ed. 459 (1862).

. The above submissions were repeatedly reinforced by Hamdi's counsel in open court. See, e.g., "Hamdi[,] as far as I know, is the only [American citizen] out of all the detainees that were gathered up on the battlefield in Afghanistan.” (Tr. of Oct. 28, 2000 oral argument at 37); Hamdi’s counsel describing as "correct” the district judge’s statement that "this man was in a fighting situation.... He was where the fight was.” (Tr. of Aug. 13, 2002 district court proceedings at 70-71). Indeed, as Judge Traxler’s thoughtful opinion indicates, the record is replete with admissions that Hamdi was captured in Afghanistan during hostilities, references that are fully consistent with the panel opinion and that make the locus of Hamdi’s seizure susceptible to little more than metaphysical doubt. The fact that the panel may not have specifically quoted all such references in its opinion in no way implies that it rejected their validity.
The dissent makes the contention that Ham-di's father as next friend is incapable of making representations on Hamdi’s behalf. Post at 371. But the cases my colleague cites in no way involved the constitutional principles implicated by a foreign battlefield capture. See White v. Miller, 158 U.S. 128, 15 S.Ct. 788, 39 L.Ed. 921 (1895); Kingsbury v. Buckner, 134 U.S. 650, 10 S.Ct. 638, 33 L.Ed. 1047 (1890); Stolte v. Larkin, 110 F.2d 226, 233 (8th Cir.1940). In seeking to deny effect to the filings of the next friend in this case, the dissent’s approach would abrogate yet once again the separation of powers by endowing those deemed enemy combatants with rights comparable to those enjoyed by ordinary civil or criminal litigants. And in decrying this reasoning as "dizzyingly circular”, see post at 371 n.l, the dissent again makes clear that nothing less than a full judicial exploration of the circumstances of petitioner’s capture will suffice.

. My colleague Judge Luttig’s dissent attempts to straddle the issue by taking sides with both parties. On the one hand, it asserts that "the panel found itself simply unwilling to allow petitioner Hamdi to challenge the facts supporting his designation by the Executive as an enemy combatant.” Post at 358. On the other hand, it argues that it is likely that "the facts recited in Special Advisor Mobbs’ affidavit, as to which there is not even hint of fabrication, are sufficient to satisfy the constitutionally appropriate standard.” Post at 367. In all events, the panel had before it the straightforward situation where petitioners' filings repeatedly corroborated the government's assertions that the locus of Ham-di's capture was a zone of active combat operations abroad. Unsurprisingly, the panel addressed the case on the basis of what was before it.