**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

YASER ESAM HAMDI; ESAM FOUAD
HAMDI, as next friend of Yaser
Esam Hamdi,
        *Petitioners-Appellees,*

v.

DONALD RUMSFELD; W. R. PAULETTE,
Commander,
        *Respondents-Appellants.*

CENTER FOR CONSTITUTIONAL RIGHTS;
RICHARD L. ABEL, Connell Professor
of Law, University of California at
Los Angeles; WILLIAM J. ACEVES,
Professor of Law, California
Western School of Law; BRUCE A.
ACKERMAN, Sterling Professor of
Law & Political Science, Yale
University; LEE A. ALBERT,
Professor of Law, University at
Buffalo Law School, The State
University of New York; BARBARA
BADER ALDAVE, Loran L. Stewart
Professor of Corporate Law,
University of Oregon School of
Law; ALICIA ALVAREZ, Clinical
Associate Professor of Law, DePaul
University School of Law; DIANE
MARIE AMANN, Professor of Law,
University of California, Davis,
School of Law; MICHELLE J.
ANDERSON, Associate Professor of

No. 02-7338

Law, Villanova University School of Law; FRAN ANSLEY, Professor of Law, University of Tennessee College of Law; ELVIA R. ARRIOLA, Associate Professor of Law, Northern Illinois University College of Law; FRANK ASKIN, Professor of Law and Robert Knowlton Scholar, Rutgers School of Law at Newark; MILNER S. BALL, Caldwell Professor of Constitutional Law, University of Georgia School of Law; JON BAUER, Clinical Professor of Law and Director, Asylum & Human Rights Clinic University of Connecticut School of Law; PAUL SCHIFF BERMAN, Associate Professor, University of Connecticut School of Law; CYNTHIA BOWMAN, Professor of Law, Northwestern University School of Law; MARK S. BRODIN, Professor of Law, Boston College Law School; BARTRAM S. BROWN, Professor of Law, Chicago-Kent College of Law, Illinois Institute of Technology; SUE BRYANT, Director of Clinical Education and Associate Professor of Law, CUNY School of Law; BURTON CAINE, Professor of Law, Temple University School of Law; EMILY CALHOUN, Professor of Law, University of Colorado School of Law; ANUPAM CHANDER, Acting Professor of Law, University of California, Davis, School of Law;

ERWIN CHEMERINSKY, Sydney M. Irmas Professor of Public Interest Law, Legal Ethics and Political Science, University of Southern California Law School; PAUL G. CHEVIGNY, Joel S. and Anne B. Ehrenkranz Professor of Law, New York University Law School; PAUL CHILL, Clinical Professor of Law, University of Connecticut School of Law; GABRIEL J. CHIN, Rufus King Professor of Law, University of Cincinnati College of Law; CAROL CHOMSKY, Associate Professor of Law, University of Minnesota Law School; MARGARET CHON, Associate Professor of Law, Seattle University School of Law; MARJORIE COHN, Associate Professor of Law, Thomas Jefferson School of Law, San Diego; ROBIN MORRIS COLLIN, Professor of Law, University of Oregon School of Law; DENNIS E. CURTIS, Clinical Professor of Law, Yale Law School; ERIN DALY, Associate Professor of Law, Widener University; MICHAEL H. DAVIS, Professor of Law, Cleveland State University; MICHAEL DEUTSCH, Adjunct Professor of Law, Northwestern University School of Law; LAURA DICKINSON, Associate Professor, University of Connecticut School of Law; ROBERT DINERSTEIN, Associate Dean and Professor of

Law, American University,
Washington College of Law; JANE
DOLKART, Associate Professor of
Law, Dedman School of Law,
Southern Methodist University;
SHARON DOLOVICH, Acting Professor
of Law, University of California at
Los Angeles; DOUGLAS L. DONOHO,
Professor of Law, Nova
Southeastern University, Shepard
Broad Law Center; DOLORES
DONOVAN, Professor of Law,
University of San Francisco School
of Law; MARY L. DUDZIAK, Judge
Edward J. and Ruey L. Guirado
Professor of Law and History,
University of Southern California
Law School; Visiting Research
Scholar, Woodrow Wilson School
of Public and International Affairs,
Princeton University; PAMELA
EDWARDS, Assistant Professor of
Law, CUNY School of Law; NANCY
EHRENREICH, Associate Professor of
Law, University of Denver College
of Law; ROSA EHRENREICH BROOKS,
Associate Professor of Law,
University of Virginia School of
Law; J. SOFFIYAH ELIJAH, Clinical
Instructor, Criminal Justice Institute,
Harvard Law School; SUSAN J.
FEATHERS, Esq., Director, Public
Service Program, University of
Pennsylvania Law School; MARVIN
FEIN, Associate Professor,

University of Pittsburgh School of Law; TODD D. FERNOW, Professor of Law, Director, Criminal Clinic, University of Connecticut School of Law; SALLY FRANK, Professor of Law, Drake University School of Law; KATHERINE FRANKE, Professor of Law, Columbia University; ERIC M. FREEDMAN, Professor of Law, Hofstra University School of Law; NIELS W. FRENZEN, Clinical Assistant Professor of Law, University of Southern California; CRAIG B. FUTTERMAN, Assistant Clinical Professor of Law, University of Chicago Law School; KRISTIN BOOTH GLEN, Dean and Professor of Law, CUNY School of Law; BRIAN GLICK, Associate Clinical Professor of Law, Fordham Law School; HOWARD A. GLICKSTEIN, Dean and Professor of Law, Touro Law School; PHYLLIS GOLDFARB, Professor of Law, Boston College Law School; BOB GOLTEN, Director, International Human Rights Advocacy Center, University of Denver; CARLOS E. GONZALEZ, Associate Professor of Law, Rutgers School of Law - Newark; Visiting Associate Professor of Law, Santa Clara University School of Law; KENNETH W. GRAHAM, JR., Professor of Law, University of California at Los Angeles; ARIELA GROSS,

Professor of Law & History, The Law School, University of Southern California; Louise Halper, Professor of Law, Washington & Lee University School of Law; Joel F. Handler, Richard C. Maxwell Professor of Law and Professor of Policy Studies, School of Public Policy and Social Research, University of California at Los Angeles; Sidney L. Harring, Professor of Law, CUNY Law School; Virginia Hench, Associate Professor of Criminal Law & Procedure & Civil Rights, University of Hawaii - Manoa; Kathy Hessler, Professor, Case Western Reserve University School of Law; Judith L. Holmes, Assistant Professor of Legal Studies, University of Massachusetts - Amherst; Wythe W. Holt, Jr., University Research Professor of Law, University of Alabama School of Law; Joan Howarth, Professor of Law, University of Nevada, Las Vegas; Marsha Huie, Professor of Law, The University of Tulsa College of Law; Eric S. Janus, Professor of Law, William Mitchell

College of Law; PAULA C. JOHNSON, Associate Professor of Law, Syracuse University College of Law; JOSE R. JUAREZ, JR., Professor of Law, St. Mary's University School of Law; DAVID KAIRYS, James E. Beasley Professor of Law, Beasley School of Law, Temple University; YALE KAMISAR, Clarence Darrow Distinguished University Professor of Law, University of Michigan; JERRY KANG, Professor of Law, University of California at Los Angeles; LEWIS R. KATZ, John C. Hutchins Professor of Law, Case Western Reserve University Law School; EILEEN KAUFMAN, Professor of Law, Touro Law School; MICHAEL J. KELLY, Assistant Professor, Creighton University School of Law; RANETA LAWSON MACK, Professor of Law, Creighton University School of Law; DAVID P. LEONARD, Professor of Law and William M. Rains Fellow, Loyola Law School, Los Angeles; JOHN LEUBSDORF, Professor of Law, Rutgers Law School - Newark; MARTIN L. LEVY, Professor, Thurgood Marshall School of Law, Texas Southern University; JULES LOBEL, Professor of Law, University of Pittsburgh Law School; DAVID LUBAN, Frederick Haas Professor of

Law and Philosophy, Georgetown University Law Center; Beth Lyon, Assistant Professor of Law, Villanova University School of Law; Holly Maguigan, Professor of Clinical Law, New York University School of Law; Samuel A. Marcosson, Associate Professor, Louis D. Brandeis School of Law, University of Louisville; Gary M. Maveal, Associate Professor of Law, University of Detroit Mercy School of Law; Robert F. Meagher, Emeritus Professor, Fletcher School of Law and Diplomacy, Tufts University; Carlin Meyer, Professor of Law, New York Law School; Jonathan M. Miller, Professor of Law, Southwestern University School of Law; Margaret E. Montoya, Professor of Law, University of New Mexico School of Law; Beverly Moran, Professor of Law, Professor of Sociology, Vanderbilt University School of Law; David A. Moran, Assistant Professor of Law, Wayne State University Law School; Mary-Beth Moylan, Instructor of Law, University of the Pacific, McGeorge School of Law; Millard A. Murphy, Esq., Clinical Instructor, Prison Law Clinic, University of California, Davis, School of Law; Kenneth B. Nunn,

Professor of Law, Fredric G. Levin College of Law, University of Florida; JAMES P. OGILVY, Associate Professor of Law, Columbus School of Law, The Catholic University of America; NANCY K. OTA, Professor of Law, Albany Law School; MARC R. POIRIER, Professor of Law, Seton Hall Law School; JAMES POPE, Professor of Law and Sidney Reitman Scholar, Rutgers University School of Law; DEBORAH W. POST, Professor of Law, Touro Law School; WILLIAM QUIGLEY, Professor of Law and Director of the Loyola Law Clinic & the Gillis Long Poverty Law Center, Loyola Law School; MARGARET JANE RADIN, Wm. Benjamin Scott and Luna M. Scott Professor of Law, Stanford Law School; MARTHA RAYNER, Associate Clinical Professor of Law, Fordham University School of Law; JUDITH RESNICK, Arthur Liman Professor of Law, Yale Law School; PAULA R. RHODES, Associate Professor of Law, Director, LLM in American and Comparative Law Program, University of Denver College of Law; HENRY J. RICHARDSON, III, Peter J. Liacouras Professor of Law, Temple Law School; ANNELISE RILES,

Professor of Law and Professor of Anthropology, Cornell University; Toni Robinson, Professor of Law, Quinnipiac School of Law; Florence Wagman Roisman, Professor of Law and Paul Beam Fellow, Indiana University School of Law-Indianapolis; Kermit Roosevelt, Assistant Professor, University of Pennsylvania Law School; Tanina Rostain, Associate Professor, New York Law School; Jed Rubenfeld, Robert R. Slaughter Professor of Law, Yale University; David Rudovsky, Senior Fellow, University of Pennsylvania Law School; Leila Nadya Sadat, Professor of Law, Washington University in St. Louis; Natsu Taylor Saito, Professor of Law, Georgia State University College of Law; Robert F. Seibel, Professor of Law, CUNY Law School; Franklin Siegel, City University of New York School of Law; Robert A. Sedler, Distinguished Professor of Law and Gibbs Chair in Civil Rights and Civil Liberties, Wayne State University; Marci Seville, Associate Professor of Law and Director, Women's Employment Rights Clinic, Golden Gate University School of Law;

MARJORIE SILVER, Professor, Touro Law Center; EILEEN SILVERSTEIN, Zephaniah Swift Professor of Law, University of Connecticut; DAVID SLOSS, Assistant Professor of Law, Saint Louis University School of Law; RONALD C. SLYE, Associate Professor, Seattle University School of Law; LLOYD B. SNYDER, Professor of Law, Cleveland State University; ANDREJ THOMAS STARKIS, Assistant Professor of Law, Massachusetts School of Law; NORMAN STEIN, Douglas Arant Professor of Law, University of Alabama School of Law; JOAN STEINMAN, Distinguished Professor of Law, Chicago-Kent College of Law; ROBERT N. STRASSFELD, Professor of Law, Case Western Reserve University School of Law; ROBERT L. TSAI, Assistant Professor of Law, University of Oregon School of Law; BETH VAN SCHAACK, Assistant Professor, Santa Clara University School of Law; DEBORAH M. WEISSMAN, Associate Professor of Law and Director of Clinical Programs, University of North Carolina School of Law; CHARLES E. WILSON, Associate Professor of Law, The Ohio State University

College of Law; RICHARD J. WILSON, Professor, Washington College of Law, American University; ADAM WINKLER, Acting Professor of Law, University of California at Los Angeles; STEPHEN WIZNER, William O. Douglas Clinical Professor of Law and Supervising Attorney, Yale Law School; MARK E. WOJCIK, Associate Professor of Law, The John Marshall Law School, Chicago; FRANK H. WU, Professor of Law, Howard University; CLIFF ZIMMERMAN, Clinical Associate Professor of Law, Northwestern University; NATIONAL LAWYERS' GUILD, Heidi Boghosian, Executive Director; NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, Dan Kesselbrenner, Executive Director; NATIONAL LAWYERS GUILD NEW YORK CHAPTER, Dana Biberman, President; HUMAN RIGHTS WATCH, James Ross, Senior Legal Counsel; SOUTHERN POVERTY LAW CENTER, Rhonda Brownstein, Legal Director; UNITARIAN UNIVERSALIST SERVICE COMMITTEE, Denise Moorehead, Deputy Director of Program; PUERTO RICO LEGAL DEFENSE AND EDUCATION FUND,

INCORPORATED, Foster Maer, Acting Legal Director; NATIONAL COALITION TO PROTECT POLITICAL FREEDOM, Kit Gage, President; FIRST AMENDMENT FOUNDATION, Kit Gage, Director; NATIONAL LAWYER'S GUILD/MAURICE & JANE SUGAR LAW CENTER FOR ECONOMIC & SOCIAL JUSTICE, Julie Hurwitz, Executive Director; CIVIL LIBERTIES MONITORING PROJECT, Jared Rossman, President; ASSOCIATION OF LEGAL AID ATTORNEYS, U.A.W. LOCAL 2325, Michael Letwin, Esq., President; PARTNERSHIP FOR CIVIL JUSTICE, Mara Verheyden-Hilliard, co-founder; TRIAL LAWYERS FOR PUBLIC JUSTICE, Rebecca Epstein, Staff Attorney; FREEDOM SOCIALIST PARTY, Val Carlson; JEWISH ALLIANCE FOR LAW AND SOCIAL ACTION, Andrew M. Fischer; THE INNOCENCE PROJECT AT THE BENJAMIN N. CARDOZO SCHOOL OF LAW, Nina Morrison, Esq., Executive Director; ELLA BAKER CENTER FOR HUMAN RIGHTS, Van Jones, National Executive Director; AMERICAN FRIENDS SERVICE COMMITTEE, Mary Ellen McNish, General Secretary;

REBER BOULT, Esq., Albuquerque, New Mexico; HUNTER GRAY; JOHN MAGE, Esq., New York, New York; DOUGLAS N. MASTERS, Esq., Chicago, Illinois; LAURA BETH NIELSEN, Research Fellow, American Bar Foundation; LEONARD WEINGLASS, Esq., New York, New York; CAMILLE WHITWORTH, Esq., Austin, Texas; MITCHELL ZIMMERMAN, Esq., Co-Coordinator, Law Professors for the Rule of Law; NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS; AMERICAN CIVIL LIBERTIES UNION FOUNDATION; AMERICAN CIVIL LIBERTIES FOUNDATION OF VIRGINIA;
*Amici Curiae in support of Appellees.*

RUTH WEDGWOOD, Professor of Law, Yale University Law School; SAMUEL ESTREICHER, Professor of Law, New York University School of Law; DOUGLAS W. KMIEC, Dean & St. Thomas More Professor of Law, Catholic University; RONALD ROTUNDA, George Mason University Foundation Professor of Law, George Mason University School of Law; DAVID B. RIVKIN, JR.; LEE A. CASEY; DARIN R. BARTRAM,
*Amici Curiae in support of Appellants.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Robert G. Doumar, Senior District Judge.
(CA-02-439-2)

Argued: October 28, 2002

Decided: January 8, 2003

Before WILKINSON, Chief Judge, and WILKINS and
TRAXLER, Circuit Judges.

---

Reversed and remanded with directions to dismiss by published opinion. Opinion by WILKINSON, Chief Judge, and WILKINS and TRAXLER, Circuit Judges, in which all three concur.

---

## COUNSEL

**ARGUED:** Paul Clement, Deputy Solicitor General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Frank Willard Dunham, Jr., Federal Public Defender, Norfolk, Virginia, for Appellees. **ON BRIEF:** Paul J. McNulty, United States Attorney, Gregory G. Garre, Assistant to the Solicitor General, David B. Salmons, Assistant to the Solicitor General, Lawrence R. Leonard, Managing Assistant United States Attorney, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Larry W. Shelton, Assistant Federal Public Defender, Geremy C. Kamens, Assistant Federal Public Defender, Norfolk, Virginia, for Appellees. David B. Rivkin, Jr., Lee A. Casey, Darin R. Bartram, BAKER & HOSTETLER, L.L.P., Washington, D.C., for Amici Curiae Ruth Wedgwood, et al. Shayana Kadidal, Barbara Olshansky, Michael Ratner, William Goodman, CENTER FOR CONSTITUTIONAL RIGHTS, New York, New York, for Amici Curiae Center for Constitutional Rights, et al. Steven D. Benjamin, Richmond, Virginia; Donald G. Rehkopf, Jr., BRENNA & BRENNA, Rochester, New York, for Amicus Curiae Association of Criminal

Defense Lawyers. Steven R. Shapiro, Lucas Guttentag, Arthur N. Eisenberg, Robin Goldfaden, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Rebecca K. Glenberg, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA, Richmond, Virginia, for Amici Curiae ACLU, et al.

---

## OPINION

WILKINSON, Chief Judge, and WILKINS and TRAXLER, Circuit Judges:

Yaser Esam Hamdi filed a petition under 28 U.S.C. § 2241 challenging the lawfulness of his confinement in the Norfolk Naval Brig.[1] On this third and latest appeal, the United States challenges the district court's order requiring the production of various materials regarding Hamdi's status as an alleged enemy combatant. The district court certified for appeal the question of whether a declaration by a Special Advisor to the Under Secretary of Defense for Policy setting forth what the government contends were the circumstances of Hamdi's capture was sufficient by itself to justify his detention. Because it is undisputed that Hamdi was captured in a zone of active combat in a foreign theater of conflict, we hold that the submitted declaration is a sufficient basis upon which to conclude that the Commander in Chief has constitutionally detained Hamdi pursuant to the war powers entrusted to him by the United States Constitution. No further factual inquiry is necessary or proper, and we remand the case with directions to dismiss the petition.

### I.

As recounted in earlier appeals regarding Hamdi's detention, *Hamdi v. Rumsfeld*, 294 F.3d 598 (4th Cir. 2002) ("*Hamdi I*"), and *Hamdi v. Rumsfeld*, 296 F.3d 278 (4th Cir. 2002) ("*Hamdi II*"), the

---

[1] The court expresses its appreciation to the Public Defender's Office for the Eastern District of Virginia, the United States Attorney's Office for the Eastern District of Virginia, and the Solicitor General's Office for the professionalism of their efforts throughout these expedited appeals.

al Qaida terrorist network, utilizing commercial airliners, launched massive attacks on the United States on September 11, 2001, successfully striking the World Trade Center in New York City, and the Pentagon, the military headquarters of our country, near Washington, D.C. A third unsuccessful attack upon at least one additional target, most likely within Washington, D.C., was foiled by the efforts of the passengers and crew on the highjacked airliner when it crashed in Somerset County, Pennsylvania, southeast of Pittsburgh. In total, over 3,000 people were killed on American soil that day.

In the wake of this atrocity, Congress authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" or "harbored such organizations or persons." Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001). The President responded by ordering United States armed forces to Afghanistan to subdue al Qaida and the governing Taliban regime supporting it. During this ongoing military operation, thousands of alleged enemy combatants, including Hamdi, have been captured by American and allied forces.

The present case arises out of Hamdi's detention by the United States military in Norfolk, Virginia. Hamdi apparently was born in Louisiana but left for Saudi Arabia when he was a small child. Although initially detained in Afghanistan and then Guantanamo Bay, Hamdi was transferred to the Norfolk Naval Station Brig after it was discovered that he may not have renounced his American citizenship. He has remained in Norfolk since April 2002.

In June 2002, Hamdi's father, Esam Fouad Hamdi, filed a petition for writ of habeas corpus, naming as petitioners both Hamdi and himself as next friend.[2] The petition alleged that Hamdi is a citizen of the United States who was residing in Afghanistan when he was seized

[2]This court has previously determined that Esam Fouad Hamdi is a proper next friend. *Hamdi I*, 294 F.3d at 600 n.1. Two earlier petitions filed by the Federal Public Defender for the Eastern District of Virginia Frank Dunham and Christian Peregrim, a private citizen from New Jersey, were dismissed. Neither Dunham nor Peregrim had a significant relationship with the detainee, and Hamdi's father plainly did. *Id.* at 606.

by the United States government. According to the petition, "[i]n the course of the military campaign, and as part of their effort to over-throw the Taliban, the United States provided military assistance to the Northern Alliance, a loosely-knit coalition of military groups opposed to the Taliban Government," and thereby "obtained access to individuals held by various factions of the Northern Alliance." The petition further alleges that "Hamdi was captured or transferred into the custody of the United States in the Fall of 2001" in Afghanistan, transported from Afghanistan to Camp X-Ray at the United States Naval Base in Guantanamo Bay, Cuba, in January 2002, and ulti-mately transferred to the Norfolk Naval Station Brig in Norfolk, Vir-ginia, in April 2002.

Although acknowledging that Hamdi was seized in Afghanistan during a time of active military hostilities, the petition alleges that "as an American citizen, . . . Hamdi enjoys the full protections of the Constitution," and that the government's current detention of him in this country without charges, access to a judicial tribunal, or the right to counsel, "violate[s] the Fifth and Fourteenth Amendments to the United States Constitution." By way of relief, the petition asks, inter alia, that the district court: (1) "Order Respondents to cease all inter-rogations of Yaser Esam Hamdi, direct or indirect, while this litiga-tion is pending"; (2) "Order and declare that Yaser Esam Hamdi is being held in violation of the Fifth and Fourteenth Amendments to the United States Constitution"; (3) "To the extent Respondents contest any material factual allegations in th[e] Petition, schedule an evidenti-ary hearing, at which Petitioners may adduce proof in support of their allegations"; and (4) "Order that Petitioner Yaser Esam Hamdi be released from Respondents' unlawful custody."

On June 11, before the government had time to respond to the peti-tion, the district court appointed Public Defender Frank Dunham as counsel for the detainee and ordered the government to allow the Defender unmonitored access to Hamdi. On July 12, we reversed the district court's order granting counsel immediate access to Hamdi. *Hamdi II*, 296 F.3d at 279. We cautioned that Hamdi's petition involved complex and serious national security issues and found that the district court had not shown proper deference to the government's legitimate security and intelligence interests. We did not order the petition dismissed outright, however, noting our reluctance to "em-

brac[e] [the] sweeping proposition . . . that, with no meaningful judicial review, any American citizen alleged to be an enemy combatant could be detained indefinitely without charges or counsel on the government's say-so." *Id.* at 283. Rather, we sanctioned a limited and deferential inquiry into Hamdi's status, noting "that if Hamdi is indeed an 'enemy combatant' who was captured during hostilities in Afghanistan, the government's present detention of him is a lawful one." *Id.* (citing *Ex parte Quirin*, 317 U.S. 1, 31, 37 (1942)). We also instructed that, in conducting the inquiry, "the district court must consider the most cautious procedures first, conscious of the prospect that the least drastic procedures may promptly resolve Hamdi's case and make more intrusive measures unnecessary." *Id.* at 284.

Following this remand, the district court held a hearing on July 18. During this hearing, the court expressed its concern over possible violations of Hamdi's rights as an American citizen. The court also questioned the government's most basic contentions regarding the ongoing hostilities, asking "with whom is the war I should suggest that we're fighting?" and "will the war never be over as long as there is any member [or] any person who might feel that they want to attack the United States of America or the citizens of the United States of America?" The court directed that "[a]ll of these [answers should] be provided in the answer that the government is to file to the petition" and directed the United States to file such a response to Hamdi's petition by July 25.

On July 25, the government filed a response to, and motion to dismiss, the petition for a writ of habeas corpus. Attached to its response was an affidavit from the Special Advisor to the Under Secretary of Defense for Policy, Michael Mobbs, which confirms the material factual allegations in Hamdi's petition — specifically, that Hamdi was seized in Afghanistan by allied military forces during the course of the sanctioned military campaign, designated an "enemy combatant" by our Government, and ultimately transferred to the Norfolk Naval Brig for detention. Thus, it is undisputed that Hamdi was captured in Afghanistan during a time of armed hostilities there. It is further undisputed that the executive branch has classified him as an enemy combatant.

In addition to stating that Hamdi has been classified as an enemy combatant, the Mobbs declaration went on further to describe what

the government contends were the circumstances surrounding Hamdi's seizure, his transfer to United States custody, and his placement in the Norfolk Naval Brig. According to Mobbs, the military determined that Hamdi "traveled to Afghanistan in approximately July or August of 2001" and proceeded to "affiliate[ ] with a Taliban military unit and receive[ ] weapons training." While serving with the Taliban in the wake of September 11, he was captured when his Taliban unit surrendered to Northern Alliance forces with which it had been engaged in battle. He was in possession of an AK-47 rifle at the time of surrender. Hamdi was then transported with his unit from Konduz, Afghanistan to the Northern Alliance prison in Mazar-e-Sharif, Afghanistan and, after a prison uprising there, to a prison at Sheberghan, Afghanistan. Hamdi was next transported to the U.S. short term detention facility in Kandahar, and then transferred again to Guantanamo Bay and eventually to the Norfolk Naval Brig. According to Mobbs, interviews with Hamdi confirmed the details of his capture and his status as an enemy combatant.

In keeping with our earlier instruction that the district court should proceed cautiously in reviewing military decisions reached during sanctioned military operations, we directed the district court to first "consider the sufficiency of the Mobbs declaration as an independent matter before proceeding further." Following this order, the district court held a hearing on August 13 to review the sufficiency of the Mobbs declaration.

During this hearing, the district court recognized that "the government is entitled to considerable deference in detention decisions during hostilities." The court also noted that it did not "have any doubts [Hamdi] had a firearm [or] any doubts he went to Afghanistan to be with the Taliban." Despite these observations, however, the court asserted that it was "challenging everything in the Mobbs' declaration" and that it intended to "pick it apart" "piece by piece." The court repeatedly referred to information it felt was missing from the declaration, asking "Is there anything in here that said Hamdi ever fired a weapon?" The court questioned whether Mr. Mobbs was even a government employee and intimated that the government was possibly hiding disadvantageous information from the court.

The district court filed an opinion on August 16, finding that the Mobbs declaration "falls far short" of supporting Hamdi's detention.

The court ordered the government to turn over, among other things, copies of Hamdi's statements and the notes taken from any interviews with him; the names and addresses of all interrogators who have questioned Hamdi; statements by members of the Northern Alliance regarding the circumstances of Hamdi's surrender; and a list of the date of Hamdi's capture and all of the dates and locations of his subsequent detention.

Upon the Government's motion to certify the August 16 production order for immediate appeal, the district court certified the following question: "Whether the Mobbs Declaration, standing alone, is sufficient as a matter of law to allow a meaningful judicial review of Yaser Esam Hamdi's classification as an enemy combatant?" We then granted the Government's petition for interlocutory review pursuant to 28 U.S.C.A. § 1292(b). In so doing, we noted that "this court 'may address any issue fairly included within the certified order because it is the order that is appealable, and not the controlling question identified by the district court.'" *Hamdi v. Rumsfeld*, No. 02-7338 (4th Cir. Sept. 12, 2002) (order granting petition for interlocutory review) (quoting *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996)).

## II.

Yaser Esam Hamdi is apparently an American citizen. He was also captured by allied forces in Afghanistan, a zone of active military operations. This dual status — that of American citizen and that of alleged enemy combatant — raises important questions about the role of the courts in times of war.

## A.

The importance of limitations on judicial activities during wartime may be inferred from the allocation of powers under our constitutional scheme. "Congress and the President, like the courts, possess no power not derived from the Constitution." *Ex parte Quirin*, 317 U.S. 1, 25 (1942). Article I, section 8 grants Congress the power to "provide for the common Defence and general Welfare of the United States . . . To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water; To raise and support armies . . . [and] To provide and maintain a navy." Article II,

section 2 declares that "[t]he President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States."

The war powers thus invest "the President, as Commander in Chief, with the power to wage war which Congress has declared, and to carry into effect all laws passed by Congress for the conduct of war and for the government and regulation of the Armed Forces, and all laws defining and punishing offences against the law of nations, including those which pertain to the conduct of war." *Quirin*, 317 U.S. at 26. These powers include the authority to detain those captured in armed struggle. *Hamdi II*, 296 F.3d at 281-82.[3] These powers likewise extend to the executive's decision to deport or detain alien enemies during the duration of hostilities, *see Ludecke v. Watkins*, 335 U.S. 160, 173 (1948), and to confiscate or destroy enemy property, *see Juragua Iron Co. v. United States*, 212 U.S. 297, 306 (1909).

Article III contains nothing analogous to the specific powers of war so carefully enumerated in Articles I and II. "In accordance with this constitutional text, the Supreme Court has shown great deference to the political branches when called upon to decide cases implicating sensitive matters of foreign policy, national security, or military affairs." *Hamdi II*, 296 F.3d at 281.

The reasons for this deference are not difficult to discern. Through their departments and committees, the executive and legislative branches are organized to supervise the conduct of overseas conflict in a way that the judiciary simply is not. The Constitution's allocation of the warmaking powers reflects not only the expertise and experience lodged within the executive, but also the more fundamental truth that those branches most accountable to the people should be the ones to undertake the ultimate protection and to ask the ultimate sacrifice from them. Thus the Supreme Court has lauded "[t]he operation of a

---

[3]Persons captured during wartime are often referred to as "enemy combatants." While the designation of Hamdi as an "enemy combatant" has aroused controversy, the term is one that has been used by the Supreme Court many times. *See, e.g.*, *Madsen v. Kinsella*, 343 U.S. 341, 355 (1952); *In re Yamashita*, 327 U.S. 1, 7 (1946); *Quirin*, 317 U.S. at 31.

healthy deference to legislative and executive judgments in the area of military affairs." *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981).

The deference that flows from the explicit enumeration of powers protects liberty as much as the explicit enumeration of rights. The Supreme Court has underscored this founding principle: "The ultimate purpose of this separation of powers is to protect the liberty and security of the governed." *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991). Thus, the textual allocation of responsibilities and the textual enumeration of rights are not dichotomous, because the textual separation of powers promotes a more profound understanding of our rights. For the judicial branch to trespass upon the exercise of the warmaking powers would be an infringement of the right to self-determination and self-governance at a time when the care of the common defense is most critical. This right of the people is no less a right because it is possessed collectively.

These interests do not carry less weight because the conflict in which Hamdi was captured is waged less against nation-states than against scattered and unpatriated forces. We have emphasized that the "unconventional aspects of the present struggle do not make its stakes any less grave." *Hamdi II*, 296 F.3d at 283. Nor does the nature of the present conflict render respect for the judgments of the political branches any less appropriate. We have noted that the "political branches are best positioned to comprehend this global war in its full context," *id.*, and neither the absence of set-piece battles nor the intervals of calm between terrorist assaults suffice to nullify the warmaking authority entrusted to the executive and legislative branches.

### B.

Despite the clear allocation of war powers to the political branches, judicial deference to executive decisions made in the name of war is not unlimited. The Bill of Rights which Hamdi invokes in his petition is as much an instrument of mutual respect and tolerance as the Fourteenth Amendment is. It applies to American citizens regardless of race, color, or creed. And as we become a more diverse nation, the Bill of Rights may become even more a lens through which we recog-

nize ourselves. To deprive any American citizen of its protections is not a step that any court would casually take.

Drawing on the Bill of Rights' historic guarantees, the judiciary plays its distinctive role in our constitutional structure when it reviews the detention of American citizens by their own government. Indeed, if due process means anything, it means that the courts must defend the "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." *Powell v. Alabama*, 287 U.S. 45, 67 (1932) (internal quotation marks omitted). The Constitution is suffused with concern about how the state will wield its awesome power of forcible restraint. And this preoccupation was not accidental. Our forebears recognized that the power to detain could easily become destructive "if exerted without check or control" by an unrestrained executive free to "imprison, dispatch, or exile any man that was obnoxious to the government, by an instant declaration that such is their will and pleasure." 4 W. Blackstone, *Commentaries on the Laws of England* 349-50 (Cooley ed. 1899) (quoted in *Duncan v. Louisiana*, 391 U.S. 145, 151 (1968)).

The duty of the judicial branch to protect our individual freedoms does not simply cease whenever our military forces are committed by the political branches to armed conflict. The Founders "foresaw that troublous times would arise, when rulers and people would . . . seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law." *Ex Parte Milligan*, 71 U.S. (4 Wall.) 2, 120 (1866). While that recognition does not dispose of this case, it does indicate one thing: The detention of United States citizens must be subject to judicial review. *See Hamdi II*, 296 F.3d at 283.

It is significant, moreover, that the form of relief sought by Hamdi is a writ of habeas corpus. In war as in peace, habeas corpus provides one of the firmest bulwarks against unconstitutional detentions. As early as 1789, Congress reaffirmed the courts' common law authority to review detentions of federal prisoners, giving its explicit blessing to the judiciary's power to "grant writs of habeas corpus for the purpose of an inquiry into the cause of commitment" for federal detainees. Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 81-82. While the scope

of habeas review has expanded and contracted over the succeeding centuries, its essential function of assuring that restraint accords with the rule of law, not the whim of authority, remains unchanged. Hamdi's petition falls squarely within the Great Writ's purview, since he is an American citizen challenging his summary detention for reasons of state necessity.

C.

As the foregoing discussion reveals, the tensions within this case are significant. Such circumstances should counsel caution on the part of any court. Given the concerns discussed in the preceding sections, any broad or categorical holdings on enemy combatant designations would be especially inappropriate. We have no occasion, for example, to address the designation as an enemy combatant of an American citizen captured on American soil or the role that counsel might play in such a proceeding. *See, e.g.*, *Padilla v. Bush*, No. 02 Civ. 445 (MBM), 2002 WL 31718308 (S.D.N.Y. Dec. 4, 2002). We shall, in fact, go no further in this case than the specific context before us — that of the undisputed detention of a citizen during a combat operation undertaken in a foreign country and a determination by the executive that the citizen was allied with enemy forces.

The safeguards that all Americans have come to expect in criminal prosecutions do not translate neatly to the arena of armed conflict. In fact, if deference to the executive is not exercised with respect to military judgments in the field, it is difficult to see where deference would ever obtain. For there is a "well-established power of the military to exercise jurisdiction over members of the armed forces, those directly connected with such forces, [and] enemy belligerents, prisoners of war, [and] others charged with violating the laws of war." *Duncan v. Kahanamoku*, 327 U.S. 304, 313-14 (1946) (footnotes omitted). As we emphasized in our prior decision, any judicial inquiry into Hamdi's status as an alleged enemy combatant in Afghanistan must reflect this deference as well as "a recognition that government has no more profound responsibility" than the protection of American citizens from further terrorist attacks. *Hamdi II*, 296 F.3d at 283.

In this regard, it is relevant that the detention of enemy combatants serves at least two vital purposes. First, detention prevents enemy

combatants from rejoining the enemy and continuing to fight against America and its allies. "The object of capture is to prevent the captured individual from serving the enemy. He is disarmed and from then on he must be removed as completely as practicable from the front . . . ." *In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946). In this respect, "captivity is neither a punishment nor an act of vengeance," but rather "a simple war measure." W. Winthrop, *Military Law and Precedents* 788 (2d ed. 1920). And the precautionary measure of disarming hostile forces for the duration of a conflict is routinely accomplished through detention rather than the initiation of criminal charges. To require otherwise would impose a singular burden upon our nation's conduct of war.

Second, detention in lieu of prosecution may relieve the burden on military commanders of litigating the circumstances of a capture halfway around the globe. This burden would not be inconsiderable and would run the risk of "saddling military decision-making with the panoply of encumbrances associated with civil litigation" during a period of armed conflict. *Hamdi II*, 296 F.3d at 283-84. As the Supreme Court has recognized, "[i]t would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home." *Johnson v. Eisentrager*, 339 U.S. 763, 779 (1950).[4]

The judiciary is not at liberty to eviscerate detention interests directly derived from the war powers of Articles I and II. As the nature of threats to America evolves, along with the means of carrying those threats out, the nature of enemy combatants may change also. In the face of such change, separation of powers doctrine does

---

[4]The government has contended that appointment of counsel for enemy combatants in the absence of charges would interfere with a third detention interest, that of gathering intelligence, by establishing an adversary relationship with the captor from the outset. *See Hamdi II*, 296 F.3d at 282 (expressing concern that the June 11 order of the district court "does not consider what effect petitioner's unmonitored access to counsel might have upon the government's ongoing gathering of intelligence"). That issue, however, is not presented in this appeal.

not deny the executive branch the essential tool of adaptability. To the contrary, the Supreme Court has said that "[i]n adopting this flexible understanding of separation of powers, we simply have recognized Madison's teaching that the greatest security against tyranny . . . lies not in a hermetic division among the Branches, but in a carefully crafted system of checked and balanced power within each Branch." *Mistretta v. United States*, 488 U.S. 361, 381 (1989). If anything, separation of powers bears renewed relevance to a struggle whose unforeseeable dangers may demand significant actions to protect untold thousands of American lives.

The designation of Hamdi as an enemy combatant thus bears the closest imaginable connection to the President's constitutional responsibilities during the actual conduct of hostilities. We therefore approach this case with sensitivity to both the fundamental liberty interest asserted by Hamdi and the extraordinary breadth of warmaking authority conferred by the Constitution and invoked by Congress and the executive branch.

### III.

After the district court issued its August 16 production order, it granted respondent's motion for an interlocutory appeal of that order. The following question was certified for our review:

> Whether the Mobbs Declaration, standing alone, is sufficient as a matter of law to allow a meaningful judicial review of Yaser Esam Hamdi's classification as an enemy combatant?

As the Supreme Court has made clear, we are not limited to this single question. Rather, an appellate court may address any issue fairly included within the certified order, because "it is the *order* that is appealable, and not the controlling question identified by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (internal quotation marks omitted).

On this appeal, it is argued that Hamdi's detention is invalid even if the government's assertions were entirely accurate. If that were

clearly the case, there would be no need for further discovery such as that detailed in the August 16 production order, because Hamdi's detention would be invalid for reasons beyond the scope of any factual dispute. Indeed, any inquiry into the August 16 production order or any discussion of the certified question would be unnecessary, because neither could suffice to justify a detention that, as a threshold matter, was otherwise unlawful. Moreover, the burden of the August 16 order would necessarily outweigh any benefits if, quite independent of the disputed factual issues, Hamdi were already entitled to relief. *See* Fed. R. Civ. Proc. 26(b)(1)-(2). For that reason, any purely legal challenges to Hamdi's detention are fairly includable within the scope of the certified order. *See Juzwin v. Asbestos Corp.*, 900 F.2d 686, 692 (3d Cir. 1990) (stating that, on § 1292(b) review of an order denying a dispositive motion, an appellate court is "free to consider all grounds advanced in support of the grant of [the motion] and all grounds suggested for sustaining its denial" (internal quotation marks omitted)).

In this vein, Hamdi and amici have in fact pressed two purely legal grounds for relief: 18 U.S.C. § 4001(a) and Article 5 of the Geneva Convention. We now address them both.[5]

### A.

18 U.S.C. § 4001 regulates the detentions of United States citizens. It states in full:

(a)    No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress.

(b)(1)    The control and management of Federal penal and correctional institutions, except military or naval

---

[5]We reject at the outset one other claim that Hamdi has advanced in abbreviated form. He asserts that our approval of his continued detention means that the writ of habeas corpus has been unconstitutionally suspended. *See* U.S. Const. art. I, § 9. We find this unconvincing; the fact that we have not ordered the relief Hamdi requests is hardly equivalent to a suspension of the writ.

institutions, shall be vested in the Attorney General, who shall promulgate rules for the government thereof, and appoint all necessary officers and employees in accordance with the civil-service laws, the Classification Act, as amended[,] and the applicable regulations.

(2)     The Attorney General may establish and conduct industries, farms, and other activities and classify the inmates; and provide for their proper government, discipline, treatment, care, rehabilitation, and reformation.

18 U.S.C. § 4001 (2002). Hamdi argues that there is no congressional sanction for his incarceration and that § 4001(a) therefore prohibits his continued detention. We find this contention unpersuasive.

Even if Hamdi were right that § 4001(a) requires Congressional authorization of his detention, Congress has, in the wake of the September 11 terrorist attacks, authorized the President to "use *all necessary and appropriate force* against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" or "harbored such organizations or persons." Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001) (emphasis added). As noted above, capturing and detaining enemy combatants is an inherent part of warfare; the "necessary and appropriate force" referenced in the congressional resolution necessarily includes the capture and detention of any and all hostile forces arrayed against our troops. Furthermore, Congress has specifically authorized the expenditure of funds for "the maintenance, pay, and allowances of prisoners of war [and] other persons in the custody of the [military] whose status is determined . . . to be similar to prisoners of war." 10 U.S.C. § 956(5) (2002). It is difficult if not impossible to understand how Congress could make appropriations for the detention of persons "similar to prisoners of war" without also authorizing their detention in the first instance.

Any alternative construction of these enactments would be fraught with difficulty. As noted above, the detention of enemy combatants serves critical functions. Moreover, it has been clear since at least

1942 that "[c]itizenship in the United States of an enemy belligerent does not relieve him from the consequences of [his] belligerency." *Quirin*, 317 U.S. at 37. If Congress had intended to override this well-established precedent and provide American belligerents some immunity from capture and detention, it surely would have made its intentions explicit.

It is likewise significant that § 4001(a) functioned principally to repeal the Emergency Detention Act. That statute had provided for the preventive "apprehension and detention" of individuals inside the United States "deemed likely to engage in espionage or sabotage" during "internal security emergencies." H.R. Rep. 92-116, at 2 (Apr. 6, 1971). Proponents of the repeal were concerned that the Emergency Detention Act might, inter alia, "permit[ ] a recurrence of the round ups which resulted in the detention of Americans of Japanese ancestry in 1941 and subsequently during World War II." *Id.* There is no indication that § 4001(a) was intended to overrule the longstanding rule that an armed and hostile American citizen captured on the battlefield during wartime may be treated like the enemy combatant that he is. We therefore reject Hamdi's contention that § 4001(a) bars his detention.

B.

Hamdi and amici also contend that Article 5 of the Geneva Convention applies to Hamdi's case and requires an initial formal determination of his status as an enemy belligerent "by a competent tribunal." Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, art. 5, 6 U.S.T. 3316, 75 U.N.T.S. 135.

This argument falters also because the Geneva Convention is not self-executing. "Courts will only find a treaty to be self-executing if the document, as a whole, evidences an intent to provide a private right of action." *Goldstar (Panama) v. United States*, 967 F.2d 965, 968 (4th Cir. 1992). The Geneva Convention evinces no such intent. Certainly there is no explicit provision for enforcement by any form of private petition. And what discussion there is of enforcement focuses entirely on the vindication by diplomatic means of treaty rights inhering in sovereign nations. If two warring parties disagree about what the Convention requires of them, Article 11 instructs them

to arrange a "meeting of their representatives" with the aid of diplomats from other countries, "with a view to settling the disagreement." Geneva Convention, at art. 11. Similarly, Article 132 states that "any alleged violation of the Convention" is to be resolved by a joint transnational effort "in a manner to be decided between the interested Parties." *Id.* at art. 132; *cf. id.* at arts. 129-30 (instructing signatories to enact legislation providing for criminal sanction of "persons committing . . . grave breaches of the present Convention"). We therefore agree with other courts of appeals that the language in the Geneva Convention is not "self-executing" and does not "create private rights of action in the domestic courts of the signatory countries." *Huynh Thi Anh v. Levi*, 586 F.2d 625, 629 (6th Cir. 1978) (applying identical enforcement provisions from the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Feb. 2, 1956, 6 U.S.T. 3516, 75 U.N.T.S. 287); *see also Holmes v. Laird*, 459 F.2d 1211, 1222 (D.C. Cir. 1972) (noting that "corrective machinery specified in the treaty itself is nonjudicial").

Hamdi provides no reason to conclude that 28 U.S.C. § 2241 makes these diplomatically-focused rights enforceable by a private right of petition. Indeed, it would make little practical sense for § 2241 to have done so, since we would have thereby imposed on the United States a mechanism of enforceability that might not find an analogue in any other nation. This is not to say, of course, that the Geneva Convention is meaningless. Rather, its values are vindicated by diplomatic means and reciprocity, as specifically contemplated by Article 132. There is a powerful and self-regulating national interest in observing the strictures of the Convention, because prisoners are taken by both sides of any conflict. This is the very essence of reciprocity and, as the drafters of the Convention apparently decided, the most appropriate basis for ensuring compliance. As the Court in *Eisentrager* observed about the predecessor to the current Geneva Convention, "the obvious scheme of the Agreement [is] that responsibility for observance and enforcement of these rights is upon political and military authorities." 339 U.S. at 789 n.14.

Even if Article 5 were somehow self-executing, there are questions about how it would apply to Hamdi's case. In particular, it is anything but clear that the "competent tribunal" which would determine Hamdi's status would be an Article III court. Every country has dif-

ferent tribunals, and there is no indication that the Geneva Convention was intended to impose a single adjudicatory paradigm upon its signatories. Moreover, Hamdi's argument begs the question of what kind of status determination is necessary under Article 5 and how extensive it should be. Hamdi and the amici make much of the distinction between lawful and unlawful combatants, noting correctly that lawful combatants are not subject to punishment for their participation in a conflict. But for the purposes of this case, it is a distinction without a difference, since the option to detain until the cessation of hostilities belongs to the executive in either case. It is true that unlawful combatants are entitled to a proceeding before a military tribunal before they may be punished for the acts which render their belligerency unlawful. *Quirin*, 317 U.S. at 31. But they are also subject to mere detention in precisely the same way that lawful prisoners of war are. *Id.* The fact that Hamdi might be an unlawful combatant in no way means that the executive is required to inflict every consequence of that status on him. The Geneva Convention certainly does not require such treatment.

For all these reasons, we hold that there is no purely legal barrier to Hamdi's detention. We now turn our attention to the question of whether the August 16 order was proper on its own terms.

IV.

As we will discuss below, we conclude that Hamdi's petition fails as a matter of law. It follows that the government should not be compelled to produce the materials described in the district court's August 16 order.

We also note that the order, if enforced, would present formidable practical difficulties. The district court indicated that its production request might well be only an initial step in testing the factual basis of Hamdi's enemy combatant status. The court plainly did not preclude making further production demands upon the government, even suggesting that it might "bring Hamdi before [the court] to inquire about [his] statements."

Although the district court did not have "any doubts [that Hamdi] had a firearm" or that "he went to Afghanistan to be with the Tali-

ban," the court ordered the government to submit to the court for in camera, ex parte review: (1) "[c]opies of all Hamdi's statements, and the notes taken from any interviews with Hamdi, that relate to his reasons for going to Afghanistan, his activities while in Afghanistan, or his participation in the military forces of the Taliban or any other organization in that country"; (2) "[a] list of all the interrogators who have questioned Hamdi, including their names and addresses, and the dates of the interviews"; (3) "[c]opies of any statements by members of the Northern Alliance" regarding Hamdi's surrender; (4) "[a] list that includes the date of Hamdi's capture, and that gives all the dates and locations of his subsequent detention"; (5) "[t]he name and title of the individual within the United States Government who made the determination that Hamdi was an illegal enemy combatant"; (6) "[t]he name and title of the individual within the United States Government who made the decision to move Hamdi from Guantanamo Bay, Cuba to the Norfolk Naval Station"; and (7) "the screening criteria utilized to determine the status of Hamdi." The court's order allows the government to redact "intelligence matters" from its responses, but only to the extent that those intelligence matters are outside the scope of inquiry into Hamdi's legal status.

Hamdi argues vigorously that this order should be affirmed. Because of the alleged "breadth with which Respondents construe their authority to imprison American citizens whom they consider to be enemy combatants," Br. of the Petitioners/Appellees at 27, Hamdi argues we must allow the district court to subject the government's classification of him to a searching review. While the ordinary § 2241 proceeding naturally contemplates the prospect of factual development, *see* 28 U.S.C. §§ 2243, 2246, such an observation only begs the basic question in this case — whether further factual exploration would bring an Article III court into conflict with the warmaking powers of Article I and II. Here, the specific interests asserted by the government flow directly from the warmaking powers and are intimately connected to them. Whatever the general force of these interests (which we discussed extensively above), they are most directly implicated by captures in a zone of active combat operations.

A review of the court's August 16 order reveals the risk of "stand[ing] the warmaking powers of Articles I and II on their heads," *Hamdi II*, 296 F.3d at 284. The district court, for example, ordered the gov-

ernment to produce all Hamdi's statements and notes from interviews. Yet it is precisely such statements, relating to a detainee's activities in Afghanistan, that may contain the most sensitive and the most valuable information for our forces in the field. The risk created by this order is that judicial involvement would proceed, increment by increment, into an area where the political branches have been assigned by law a preeminent role.

The district court further ordered the government to produce a list of all interrogators who have questioned Hamdi, including their names and addresses and the dates of the interviews, copies of any statements by members of the Northern Alliance regarding Hamdi's surrender, and a list that includes the date of Hamdi's capture and all the dates and locations of his subsequent detention. Once again, however, litigation cannot be the driving force in effectuating and recording wartime detentions. The military has been charged by Congress and the executive with winning a war, not prevailing in a possible court case. Complicating the matter even further is the fact that Hamdi was originally captured by Northern Alliance forces, with whom American forces were generally allied. The district court's insistence that statements by Northern Alliance members be produced cannot help but place a strain on multilateral efforts during wartime. The court also expressed concern in its order that the Northern Alliance did not "identify the unit [to which Hamdi was affiliated]," "where or by whom [Hamdi] received weapons training or the nature and extent thereof," or "who commanded the unit or the type of garb or uniform Hamdi may have worn. . . ." In demanding such detail, the district court would have the United States military instruct not only its own personnel, but also its allies, on precise observations they must make and record during a battlefield capture.

Viewed in their totality, the implications of the district court's August 16 production order could not be more serious. The factual inquiry upon which Hamdi would lead us, if it did not entail disclosure of sensitive intelligence, might require an excavation of facts buried under the rubble of war. The cost of such an inquiry in terms of the efficiency and morale of American forces cannot be disregarded. Some of those with knowledge of Hamdi's detention may have been slain or injured in battle. Others might have to be diverted from active and ongoing military duties of their own. The logistical

effort to acquire evidence from far away battle zones might be substantial. And these efforts would profoundly unsettle the constitutional balance.

For the foregoing reasons, the court's August 16 production request cannot stand.

V.

The question remains, however, whether Hamdi's petition must be remanded for further proceedings or dismissed.

Hamdi's American citizenship has entitled him to file a petition for a writ of habeas corpus in a civilian court to challenge his detention, including the military's determination that he is an "enemy combatant" subject to detention during the ongoing hostilities. Thus, as with all habeas actions, we begin by examining the precise allegations presented to us by the respective parties. In this case, there are two allegations that are crucial to our analysis. First, Hamdi's petition alleges that he was a resident of and seized in Afghanistan, a country in which hostilities were authorized and ongoing at the time of the seizure, but that his continued detention in this country without the full panoply of constitutional protections is unlawful. Second, the Government's response asserts that Hamdi is being detained pursuant to the Commander-in-Chief's Article II war powers and that the circumstances underlying Hamdi's detention, as reflected primarily in the Mobbs declaration, establish that Hamdi's detention is lawful.

Generally speaking, in order to fulfill our responsibilities under Article III to review a petitioner's allegation that he is being detained by American authorities in violation of the rights afforded him under the United States Constitution, we must first determine the source of the authority for the executive to detain the individual. Once the source of the authority is identified, we then look at the justification given to determine whether it constitutes a legitimate exercise of that authority.

A.

Here the government has identified the source of the authority to detain Hamdi as originating in Article II, Section 2 of the Constitu-

tion, wherein the President is given the war power. We have already emphasized that the standard of review of enemy combatant detentions must be a deferential one when the detainee was captured abroad in a zone of combat operations. The President "is best prepared to exercise the military judgment attending the capture of alleged combatants." *Hamdi II*, 296 F.3d at 283. Thus, in *Quirin*, the Supreme Court stated in no uncertain terms that detentions "ordered by the President in the declared exercise of his powers as Commander in Chief of the Army in time of war and of grave public danger" should not "be set aside by the courts without the clear conviction that they are in conflict with the Constitution or laws of Congress constitutionally enacted." *Quirin*, 317 U.S. at 25.

This deferential posture, however, only comes into play after we ascertain that the challenged decision is one legitimately made pursuant to the war powers. It does not preclude us from determining in the first instance whether the factual assertions set forth by the government would, if accurate, provide a legally valid basis for Hamdi's detention under that power. Otherwise, we would be deferring to a decision made without any inquiry into whether such deference is due. For these reasons, it is appropriate, upon a citizen's presentation of a habeas petition alleging that he is being unlawfully detained by his own government, to ask that the government provide the legal authority upon which it relies for that detention and the basic facts relied upon to support a legitimate exercise of that authority. Indeed, in this case, the government has voluntarily submitted — and urged us to review — an affidavit from Michael Mobbs, Special Advisor to the Under Secretary of Defense for Policy, describing what the government contends were the circumstances leading to Hamdi's designation as an enemy combatant under Article II's war power.

The Mobbs affidavit consists of two pages and nine paragraphs in which Mobbs states that he was "substantially involved with matters related to the detention of enemy combatants in the current war against the al Qaeda terrorists and those who support and harbor them." In the affidavit, Mobbs avers that Hamdi entered Afghanistan in July or August of 2001 and affiliated with a Taliban military unit. Hamdi received weapons training from the Taliban and remained with his military unit until his surrender to Northern Alliance forces in late 2001. At the time of his capture, Hamdi was in possession of an AK-

47 rifle. After his capture, Hamdi was transferred first from Konduz, Afghanistan to the prison in Mazar-e-Sharif, and then to a prison in Sheberghan, Afghanistan where he was questioned by a United States interrogation team. This interrogation team determined that Hamdi met "the criteria for enemy combatants over whom the United States was taking control." Hamdi was then transported to the U.S. short term detention facility in Kandahar, and then transferred again to Guantanamo Bay and eventually to the Norfolk Naval Brig. According to Mobbs, a subsequent interview with Hamdi confirmed the details of his capture and his status as an enemy combatant.

The district court approached the Mobbs declaration by examining it line by line, faulting it for not providing information about whether Hamdi had ever fired a weapon, the formal title of the Taliban military unit Hamdi was with when he surrendered, the exact composition of the U.S. interrogation team that interviewed Hamdi in Sheberghan, and even the distinguishing characteristics between a Northern Alliance miliary unit and a Taliban military unit. Concluding that the factual allegations were insufficient to support the government's assertion of the power to detain Hamdi under the war power, the court then ordered the production of the numerous additional materials outlined previously. We think this inquiry went far beyond the acceptable scope of review.

To be sure, a capable attorney could challenge the hearsay nature of the Mobbs declaration and probe each and every paragraph for incompleteness or inconsistency, as the district court attempted to do. The court's approach, however, had a signal flaw. We are not here dealing with a defendant who has been indicted on criminal charges in the exercise of the executive's law enforcement powers. We are dealing with the executive's assertion of its power to detain under the war powers of Article II. *See Eisentrager*, 339 U.S. at 793 (Black, J., dissenting) ("[I]t is no 'crime' to be a soldier."); *cf. In re Winship*, 397 U.S. 358, 363 (1970) (explaining that elevated burden of proof applies in criminal cases because of consequences of conviction, including social stigma). To transfer the instinctive skepticism, so laudable in the defense of criminal charges, to the review of executive branch decisions premised on military determinations made in the field carries the inordinate risk of a constitutionally problematic intrusion into the most basic responsibilities of a coordinate branch.

The murkiness and chaos that attend armed conflict mean military actions are hardly immune to mistake. Yet these characteristics of warfare have been with us through the centuries and have never been thought sufficient to justify active judicial supervision of combat operations overseas. To inquire, for example, whether Hamdi actually fired his weapon is to demand a clarity from battle that often is not there. The district court, after reviewing the Mobbs affidavit, did not "have any doubts [Hamdi] had a firearm [or] any doubts he went to Afghanistan to be with the Taliban." To delve further into Hamdi's status and capture would require us to step so far out of our role as judges that we would abandon the distinctive deference that animates this area of law.

For these reasons, and because Hamdi was indisputably seized in an active combat zone abroad, we will not require the government to fill what the district court regarded as gaps in the Mobbs affidavit. The factual averments in the affidavit, if accurate, are sufficient to confirm that Hamdi's detention conforms with a legitimate exercise of the war powers given the executive by Article II, Section 2 of the Constitution and, as discussed elsewhere, that it is consistent with the Constitution and laws of Congress. *See Quirin*, 317 U.S. at 25. Asking the executive to provide more detailed factual assertions would be to wade further into the conduct of war than we consider appropriate and is unnecessary to a meaningful judicial review of this question.

## B.

We turn then to the question of whether, because he is an American citizen currently detained on American soil by the military, Hamdi can be heard in an Article III court to rebut the factual assertions that were submitted to support the "enemy combatant" designation. We hold that no evidentiary hearing or factual inquiry on our part is necessary or proper, because it is undisputed that Hamdi was captured in a zone of active combat operations in a foreign country and because any inquiry must be circumscribed to avoid encroachment into the military affairs entrusted to the executive branch.

In support of its contention that no further factual inquiry is appropriate, the government has argued that a "some evidence" standard should govern the adjudication of claims brought by habeas petition-

ers in areas where the executive has primary responsibility. That standard has indeed been employed in contexts less constitutionally sensitive than the present one, albeit in a procedural posture that renders those cases distinguishable. *See, e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 306 (2001) (describing historical practice under which, so long as "there was some evidence to support" a deportation order, habeas courts would not "review factual determinations made by the Executive"); *Eagles v. Samuels*, 329 U.S. 304, 312 (1946); *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925). In each of these cases, the Court indicated that the role of the writ is not to correct "mere error" in the executive's exercise of a discretionary power, but rather to check the executive branch if it asserts a "power to act beyond the authority granted." *Eagles*, 329 U.S. at 311-12. Thus, the government asserts, the role of a habeas court is not to reconsider the executive's decision, but rather only to confirm that "there was *some* basis for the challenged executive determination." Br. for Respondents-Appellants at 29. Once that determination is made, the government further asserts, the detainee may not offer any rebuttal evidence and no further factual inquiry is allowed.

It is not necessary for us to decide whether the "some evidence" standard is the correct one to be applied in this case because we are persuaded for other reasons that a factual inquiry into the circumstances of Hamdi's capture would be inappropriate.

1.

As we have emphasized throughout these appeals, we cannot set aside executive decisions to detain enemy combatants "without the clear conviction that they are in conflict with the Constitution or laws of Congress constitutionally enacted." *Quirin*, 317 U.S. at 25. We cannot stress too often the constitutional implications presented on the face of Hamdi's petition. The constitutional allocation of war powers affords the President extraordinarily broad authority as Commander in Chief and compels courts to assume a deferential posture in reviewing exercises of this authority. And, while the Constitution assigns courts the duty generally to review executive detentions that are alleged to be illegal, the Constitution does not specifically contemplate any role for courts in the conduct of war, or in foreign policy generally.

Indeed, Article III courts are ill-positioned to police the military's distinction between those in the arena of combat who should be detained and those who should not. Any evaluation of the accuracy of the executive branch's determination that a person is an enemy combatant, for example, would require courts to consider, first, what activities the detainee was engaged in during the period leading up to his seizure and, second, whether those activities rendered him a combatant or not. The first question is factual and, were we called upon to delve into it, would likely entail substantial efforts to acquire evidence from distant battle zones. *See Eisentrager*, 339 U.S. at 779. The second question may require fine judgments about whether a particular activity is linked to the war efforts of a hostile power — judgments the executive branch is most competent to make.

Hamdi's petition places him squarely within the zone of active combat and assures that he is indeed being held in accordance with the Constitution and Congressional authorization for use of military force in the wake of al Qaida's attack. *Quirin*, 317 U.S. at 25. Any effort to ascertain the facts concerning the petitioner's conduct while amongst the nation's enemies would entail an unacceptable risk of obstructing war efforts authorized by Congress and undertaken by the executive branch.

2.

Hamdi contends that, although international law and the laws of this country might generally allow for the detention of an individual captured on the battlefield, these laws must vary in his case because he is an American citizen now detained on American soil. As an American citizen, Hamdi would be entitled to the due process protections normally found in the criminal justice system, including the right to meet with counsel, if he had been charged with a crime. But as we have previously pointed out, Hamdi has not been charged with any crime. He is being held as an enemy combatant pursuant to the well-established laws and customs of war. Hamdi's citizenship rightfully entitles him to file this petition to challenge his detention, but the fact that he is a citizen does not affect the legality of his detention as an enemy combatant.

Indeed, this same issue arose in *Quirin*. In that case, petitioners were German agents who, after the declaration of war between the

United States and the German Reich, were trained at a German sabotage school where they "were instructed in the use of explosives and in methods of secret writing." *Quirin*, 317 U.S. at 21. The petitioners then journeyed by submarine to the beaches of New York and Florida, carrying large quantities of explosives and other sabotage devices. All of them were apprehended by FBI agents, who subsequently learned of their mission to destroy war industries and facilities in the United States. All of the petitioners were born in Germany but had lived in the United States at some point. One petitioner claimed American citizenship by virtue of the naturalization of his parents during his youth. The Court, however, did not need to determine his citizenship because it held that the due process guarantees of the Fifth and Sixth Amendments were inapplicable in any event. It noted that "[c]itizenship in the United States of an enemy belligerent does not relieve him from the consequences of a belligerency which is unlawful." *Id.* at 37. The petitioner who alleged American citizenship was treated identically to the other German saboteurs.

The *Quirin* principle applies here. One who takes up arms against the United States in a foreign theater of war, regardless of his citizenship, may properly be designated an enemy combatant and treated as such. The privilege of citizenship entitles Hamdi to a limited judicial inquiry into his detention, but only to determine its legality under the war powers of the political branches. At least where it is undisputed that he was present in a zone of active combat operations, we are satisfied that the Constitution does not entitle him to a searching review of the factual determinations underlying his seizure there.

3.

Similarly, we reject Hamdi's argument that even if his initial detention in Afghanistan was lawful, his continuing detention on American soil is not. Specifically, Hamdi contends that his petition does not implicate military concerns because "the underlying claims in this case are designed to test the legality of Hamdi's imprisonment in a naval brig in Norfolk, Virginia, not a military determination made overseas on the basis of caution rather than accuracy." Br. of the Petitioners/Appellees at 44. But the fact that Hamdi is presently being detained in the United States — as opposed to somewhere overseas — does not affect the legal implications of his status as an enemy

combatant. For the same reason that courts are ill-positioned to review the military's distinction between those who should or should not be detained in an arena of combat, courts are not in the position to overturn the military's decision to detain those persons in one location or another. It is not clear why the United States should be precluded from exercising its discretion to move a detainee to a site within this country, nor do we see what purpose would be served by second guessing the military's decision with respect to the locus of detention.

4.

To conclude, we hold that, despite his status as an American citizen currently detained on American soil, Hamdi is not entitled to challenge the facts presented in the Mobbs declaration. Where, as here, a habeas petitioner has been designated an enemy combatant and it is undisputed that he was captured in a zone of active combat operations abroad, further judicial inquiry is unwarranted when the government has responded to the petition by setting forth factual assertions which would establish a legally valid basis for the petitioner's detention. Because these circumstances are present here, Hamdi is not entitled to habeas relief on this basis.

C.

Finally, we address Hamdi's contention that even if his detention was at one time lawful, it is no longer so because the relevant hostilities have reached an end. In his brief, Hamdi alleges that the government "confuses the international armed conflict that allegedly authorized Hamdi's detention in the first place with an on-going fight against individuals whom Respondents refuse to recognize as 'belligerents' under international law." *Id.* at 53-54. Whether the timing of a cessation of hostilities is justiciable is far from clear. *See Ludecke*, 335 U.S. at 169 ("Whether and when it would be open to this Court to find that a war though merely formally kept alive had in fact ended, is a question too fraught with gravity even to be adequately formulated when not compelled."). The executive branch is also in the best position to appraise the status of a conflict, and the cessation of hostilities would seem no less a matter of political competence than the initiation of them. *See United States v. The Three Friends*, 166 U.S. 1,

63 (1897) ("[I]t belongs to the political department to determine when belligerency shall be recognized, and its action must be accepted according to the terms and intention expressed."). In any case, we need not reach this issue here. The government notes that American troops are still on the ground in Afghanistan, dismantling the terrorist infrastructure in the very country where Hamdi was captured and engaging in reconstruction efforts which may prove dangerous in their own right. Because under the most circumscribed definition of conflict hostilities have not yet reached their end, this argument is without merit.

## VI.

It is important to emphasize that we are not placing our imprimatur upon a new day of executive detentions. We earlier rejected the summary embrace of "a sweeping proposition — namely that, with no meaningful judicial review, any American citizen alleged to be an enemy combatant could be detained indefinitely without charges or counsel on the government's say-so." *Hamdi II*, 296 F.3d at 283. But, Hamdi is not "any American citizen alleged to be an enemy combatant" by the government; he is an American citizen captured and detained by American allied forces in a foreign theater of war during active hostilities and determined by the United States military to have been indeed allied with enemy forces.

Cases such as Hamdi's raise serious questions which the courts will continue to treat as such. The nation has fought since its founding for liberty without which security rings hollow and for security without which liberty cannot thrive. The judiciary was meant to respect the delicacy of the balance, and we have endeavored to do so.

The events of September 11 have left their indelible mark. It is not wrong even in the dry annals of judicial opinion to mourn those who lost their lives that terrible day. Yet we speak in the end not from sorrow or anger, but from the conviction that separation of powers takes on special significance when the nation itself comes under attack. Hamdi's status as a citizen, as important as that is, cannot displace our constitutional order or the place of the courts within the Framer's scheme. Judicial review does not disappear during wartime, but the review of battlefield captures in overseas conflicts is a highly deferen-

tial one. That is why, for reasons stated, the judgment must be reversed and the petition dismissed. It is so ordered.